VAL DECKER PACKING COMPANY, PLAINTIFF-APPELLEE, *v.* ARMOUR & COMPANY, DEFENDANT-APPELLANT.

Ohio Appeals, Tenth District, Franklin County.

No. 6535. Decided May 16, 1961.

*Messrs. Porter, Stanley, Treffinger & Platt, Mr. John Leddy,* of counsel, for plaintiff-appellee.

*Messrs. Dargusch, Saxbe, Dargusch, Mr. Roger F. Day,* of counsel, for defendant-appellant.

BRYANT, J. This is an appeal on questions of law from the judgment of the Common Pleas Court of Franklin County, Ohio in favor of The Val Decker Packing Company, an Ohio corporation engaged in the meat packing business of Piqua, Ohio, plaintiff-appellee, in the amount of $1,690.49 with interest at six per cent per annum from January 2, 1957, against Armour & Company, an Illinois corporation, authorized to do business in Ohio with an office in Columbus, Ohio.

This proceeding was begun with the filing of a petition by plaintiff-appellee, herein called Decker, naming as defendant-appellant, Armour & Company, herein called Armour. According to the petition, on December 26, 1956, Decker and Armour entered into a contract whereby Decker agreed to sell to Armour one truckload of "dressed, butcher hogs hung in a refrigerated truck"; that the agreed price was $8,885.51 plus freight in the amount of $496.64 prepaid by Decker; that it was agreed that the hogs were to be delivered to Western Pork Packers, Inc. of "Worcester, Massachusetts on account Armour and Company"; that on December 27, 1956, Decker shipped the hogs to Western Pork Packers, Inc., herein called Western, on account of Armour, but that Armour refused to accept and refused to pay for the shipment and likewise refused to pay the freight charges which had been advanced by Decker. Decker says it was compelled to dispose of the truckload of hogs on January 3, 1957 and that the forced sale price was $1,690.49 less than the contract price for which judgment was sought.

Armour moved to make the petition definite by requiring Decker to attach to it a copy of the written agreement and further to allege the date, time and place of delivery of the shipment of meat, but this was overruled by the trial court as was a demurrer to the petition upon the ground that it failed to state facts which show a cause of action. In support of the demurrer it was argued by Armour that the petition in alleging the contract stated that the meat shipment was to be delivered to

Western but failed to allege that the meat shipment ever was delivered.

By way of answer, Armour alleged two defenses. In the first defense, it admitted the corporate capacity of Decker and Armour, and entered a general denial of all other allegations of the petition. In the second defense, Armour alleged that the written agreement specified that the hogs "were to be shipped by the plaintiff at 11:00 P. M., December 26, 1956" to Western at Worcester, Mass., and were to be delivered there "not later than 3:00 P. M., Friday, December 28, 1956." It was further alleged that Decker selected the Wilson Freight Forwarding Company to handle the shipment and that such company, herein called Wilson, was the agent of Decker and that Decker "did not ship such hogs at 11:00 P. M., December 26, 1956; that plaintiff did not deliver such hogs" to Western "on or before 3:00 P. M., December 28, 1956, but made tender of hogs which were not properly chilled on January 3, 1957, which defendant refused to accept by giving written notice to the plaintiff who knew well that time was of the essence both by the agreement and trade custom and usage."

Decker filed a reply which contained a number of admissions, denials and averments. So far as here pertinent it admitted that the terms of the agreement were as set forth in the answer, admitted that the meat was required to be of good quality "and properly chilled"; that the meat was not shipped at 11:00 P. M., on December 26, 1956, but was delivered to Wilson at 8:55 A. M., December 27, 1956, which was in sufficient time to permit them to be transported to Worcester, Mass. by 3:00 P. M., on December 28, 1956; denied that Wilson was agent of Decker and alleged that it was agent of Armour and that title to the meat passed to Armour at the time of delivery to Wilson and that any delay in delivery was the fault of Wilson as agent of Armour; denied that time was of the essence of the agreement and alleged that possibly delay "was contemplated by the parties and provided for in the written agreement."

The matter came on for trial in the court below where a jury was waived, and many of the facts were contained in a stipulation of facts called mutual exhibit No. 1, which later was supplanted by "Amended Stipulation of Facts." So far

as we can ascertain, the only difference between the two was that at five places in the stipulation with reference to date "1957," which apparently had been used by error, was changed to "1956," the latter conforming to the facts and testimony.

The Amended Stipulation of Facts contains eight branches which are as follows:

"(1) The terms of the contract between plaintiff and defendant are as set forth in the Armour & Company Confirmation dated December 26, 1956. (Joint Exhibit No. 1.)

"(2) The order price was $8,885.51.

"(3) The plaintiff engaged the Wilson Freight Forwarding Company, Cincinnati, Ohio, to transport the hogs in a refrigerated motor truck to Western Pork Packers, Inc., Worcester, Massachusetts.

"(4) The Wilson Freight Forwarding Company truck was loaded with the hogs and departed from the plaintiff's loading dock at Piqua, Ohio, at 12:25 P. M., December 27, 1956.

"(5) On December 28, 1956, before 3:00 P. M., the Wilson Freight Forwarding Company driver telephoned Mr. Ralph Cutillo, Armour & Company manager in Worcester, Massachusetts, and stated that he had developed mechanical trouble in his tractor and could not make delivery by 3:00 P. M. that day. Mr. Cutillo authorized the driver to arrive by 6:00 A. M. December 29, 1956.

"(6) The Wilson Freight Forwarding Company truck did not arrive at Western Pork Packers, Inc. on December 29, 1956.

"(7) On December 31, 1956, the defendant refused to accept the shipment which was reconsigned and sold to Monarch Packing Company by the plaintiff for $7,203.99.

"(8) The seal on the Wilson Freight Forwarding Company truck was not broken until delivery at Monarch Packing Company."

Plaintiff at the trial called Lewis E. Decker of Piqua, Ohio, Chairman of the Board of Decker, and who at the time of the placing of the order, was sales manager and treasurer and had worked for this company for thirty-three years, of which fifteen years were in the sales department; Carl F. Decker of Piqua, Ohio, vice-president and secretary of Decker, who had been employed by them for twenty-nine years, and Thomas F. Jordon

of Piqua, Ohio, who for seven years had been employed as traffic manager of Decker.

No witnesses whatever were called by Armour and nowhere in the record have we been able to find any substantiation or evidence of any sort to the claim of Armour in its second defense that Decker "made tender of hogs which were not properly chilled." This portion of the defense failed completely and this fact appears to have been recognized by the parties hereto.

The testimony of plaintiff's witnesses strongly supported the contention of plaintiff that under the practices and usages of the meat packing industry, under agreement of the type here in question, the trucking company was the agent of Armour, title to the meat passed from Decker to Armour, when in good condition, properly chilled and properly inspected, it was placed in a refrigerated truck of Wilson and sealed ready for shipment.

One of the exhibits introduced by plaintiff, exhibit No. 2, was entitled "Trade Term Definitions," recommended for use of members of Institute of American Meat Packers in domestic commerce. Attached to the Stipulation of Facts was a document referred to in the stipulation as joint exhibit No. 1, which was entitled "Confirmation of Purchase." By the express provision of the stipulation, joint exhibit No. 1 contained the terms of the contract and in that document following the word, "terms," there appears, "C. A. F. Worcester," which was understood by all parties to mean, "cost and freight," and sometimes referred to as "cafe." Reference to plaintiff's exhibit No. 3, which was a confirmation of the order under the heading, "Price," the same designation appears namely, "C. A. F. Worcester:".

Again referring to plaintiff's exhibit No. 2, article six thereof, which appears on pages six and seven, defines the use or meaning of this term as follows:

"C. A. F. (or Cafe) (named destination)"

"Under this quotation:

"A. Seller must:

"(1) Furnish cars as specified in his obligations under Article (3) above;

"(2) Place goods on or in cars;

"(3) Secure any necessary freight contract or shipping permit;

"(4) Secure railroad bill of lading, same to be endorsed 'Lighterage Free' if so requested by Buyer, provided this can be done without additional expense to seller;

"(5) Pay (or allow) freight and cost of icing and re-icing, between point of shipment and destination;

"(6) Be responsible for any loss of or damage to goods until they have been placed on or in cars and bill of lading secured from carrier, seller not being responsible for delivery of goods at destination.

"B. Buyer must:

"(1) Assume any expense, shrinkage, loss of, and/or damage to goods after seller has fulfilled his obligations as above."

While both parties contended that C. A. F. contracts, when properly interpreted, favored their position, it would seem that Decker's chief responsibility came to an end when he fully complied with the above-quoted provision.

As heretofore indicated, the court below rendered judgment in favor of Decker and against Armour for an amount representing the difference between the contract price and the net proceeds at the subsequent sale with a small additional amount representing the cost of long distance telephone calls.

Upon appeal to this court, Armour assigned two errors as follows:

"1. The trial court erred in adjudging that time was not of the essence of the contract to sell, and that the failure of plaintiff-appellee to ship at the specified time was not a material breach thereof entitling defendant-appellant to rescind.

"2. The evidence not only fails to establish that plaintiff-appellee performed the essential terms of the contract, but on the contrary, discloses its material breach in failing to ship at the specified time."

The conclusion reached by the trial court, so far as the first assignment of error is concerned, was predicated upon the idea that the principal interest of Armour at the time the contract was entered into, centered about the arrival time of the meat shipment in Worcester, Mass. This opinion sets forth the

further conclusion that when the loading of the hogs was completed at 12:15 P. M. on December 27, 1956 and the truck of Wilson was inspected and sealed, that title passed to Armour, that Wilson was the agent of Armour and whatever mishaps or failures occurred while the hogs were in Wilson's truck were not the responsibility of Decker.

The writer has read the opinion of Judge Myron B. Gessaman, a veteran jurist of the Franklin County Common Pleas Court, with considerable care and not only finds himself in agreement with the content and the conclusions therein reached, but also feels that Judge Gessaman is to be commended for the thorough and scholarly manner in which he analyzed the problems now before the court.

It must be borne in mind that the defense offered no evidence whatsoever and that the only evidence in addition to the agreed statement of facts and exhibits was that of three employees of Decker all of whom had long periods of service and experience in the packing business. The testimony of these witnesses, in our opinion, when considered with the exhibits gave strong support to the conclusions reached by Judge Gessaman and to the theory on which plaintiff proceeded.

We have attempted to apply the various statutes involved and to give proper weight to the customs and usages of the trade. We also believe close attention must be paid to the language in the contract and what the parties said or wrote together with the reasonable inferences arising therefrom.

Armour at page eleven of its opening brief quotes from the testimony of Lewis Decker, setting forth the reasons for the emergency which faced Armour and made the purchase from Decker necessary, Mr. Decker testifying as follows:

"A. Mr. Irwin Busse of the Busse Brokerage Company phoned at approximately 5:00 on December 26 and stated that *due to snow storms in the midwest* that Armour & Co. could not secure enough live hogs to fill an order that they had taken from Western Pork Packers at Worcester, Massachusetts."

(Emphasis added.)

In light of the critical situation with which Armour was faced prior to the time of placing the order with Decker, we think the instruction or note which was typed on the "Confirmation of Purchase," attached to the Mutual Exhibit No. 1,

"Amended Stipulation of Facts," is deserving of special consideration. This note reads as follows:

"Please show on bill of lading in large size, bright colored print or crayon that Western Pork Packers Inc. desire to unload these hogs not later than 3 P. M. Friday, 12/28 and as much sooner as possible. *If delayed, truck driver to please call collect. Mr. Ralph Cutillo, Mgr. Armour & Co., 219 Summer St. Worcester, Mass. tele. No. PLEASANT 2-5653.*" (Emphasis added.)

The time for performance of the contract between Armour and Decker was in the dead of winter and Armour already had been forcefully reminded that snow storms in the Midwest could disrupt its business. Is it unreasonable to infer that they also were fully aware of the fact that Ohio, Pennsylvania, New York and Massachusetts or whatever states in the northeastern part of this country it might be necessary to cross, also experience snowstorms at this season of the year? The inclusion of the foregoing directions to the truck driver was an act of wisdom and the refrigerator truck of Wilson did have a breakdown, although in the record it was attributed to mechanical difficulties.

The inference, that delays and breakdowns in the movement of goods and merchandise by truck in the winter time were not totally unforeseen and perhaps were anticipated, is further borne out by the evidence that when sometime prior to 3 P. M., Friday, December 28, 1956, Wilson's truck did suffer a breakdown and the truck driver called Armour's manager in Worcester, Mass., and an extension by Armour of fifteen hours for acceptable delivery expiring at 6 A. M., Saturday, December 29, 1956 was forthcoming.

We are not unmindful of the fact that the contract about which the litigation centers was brought about by a most commendable desire on the part of Armour to live up to its contract commitments with Western. We also wish to recognize the diligence displayed by counsel for Decker and Armour in the preparation of their briefs and the oral arguments with respect to the questions here involved.

We conclude therefore for the reasons above set forth that the trial court did not err in holding that time was not of the essence of the contract to sell, and that the failure of

Decker to ship at 11:00 P. M., Wednesday, December 26, 1956 was not a material breach entitling Armour to rescind the contract.

We further conclude that the evidence did establish that plaintiff-appellee performed the essential terms of its contract and that the evidence did not disclose a material breach in failing to ship at the specified time.

It follows therefore, in our opinion, that neither assignment of error is well taken, that both must be and hereby are overruled, that the finding and judgment of the court below must be and hereby are affirmed and the cause remanded to the court below for further proceedings in accordance with law and that the costs shall be assessed against defendant-appellant.

DUFFY, J., concurs in judgment.
DUFFEY, P. J., dissents.

DUFFEY, P. J., dissents. The trial court found that the parties contemplated C. A. F. contract. Both counsel agree. It is also agreed that under a C. A. F. contract the buyer procures the transportation (here a truck from Wilson Freight) and loads the merchandise. Upon sealing the load, the title passes to the buyer. From that point on (with exceptions not pertinent here) all risks of transit and delivery fall upon the buyer.

The contract here was originally an oral one made by telephone by the Armour Company, acting through a broker (Busse), and Val Decker. It is stipulated that the terms of the contract are those contained in Armour's confirmation letter dated December 26, 1956. The portions pertinent to this suit are:

"Terms—C. A. F. Worcester; Thru: Worcester County Trust Co., Worcester, Mass.

"Shipping date—11 P. M. 12/26/56.

"Ship to—Western Pork Packers, Inc. Destination—288 Franklin St., Worcester, Mass.

"Note: Please show on bill of lading in large size, bright colored print or crayon that Western Pork Packers Inc. desire to unload these hogs not later than 3 P. M. Friday, 12/28 and as much sooner as possible. If delayed, truck driver to please

call collect, Mr. Ralph Cutillo, Mgr. Armour & Co. 219 Summer St. Worcester, Mass. tele. No. PLEASANT 2-5653.''

It should be noted here that the provision about the time of *delivery* to Western is on its face, and on the testimony of the witnesses, a statement of instructions for the carrier rather than a term of the contract.

As the above quotation shows, the contract explicitly specified a time of *Shipment.* Appellee admits that shipment did not take place until 12:25 P. M. on December 27—some thirteen and one-half hours past the time specified in the contract. While in transit there was a mechanical breakdown. The driver called Armour and was authorized to arrive at Western by 6:00 A. M. on December 29. He did not arrive at that time and, in fact, not until after the 29th (apparently sometime on the 31st.) Armour refused to accept the shipment.

In a C. A. F. contract the *promised performance* is *shipment* i. e. delivery on board the carrier. Val Decker, even in the absence of a specific provision, would be obligated to ship within a reasonable time. I do not interpret the majority opinion, or the lower court's, as suggesting that the contemplated performance by Val Decker was in the alternative i. e. that Val Decker could ship C. A. F. on the 26th or deliver before 3:00 P. M. December 28.

Appellee states that the basic issue is, ''Was the time of shipment from appellee's plant in Piqua, Ohio of the essence in the contract between appellant and appellee?'' Of course, time is always of the ''essence,'' if the reference is to the obligations of the one not performing on time. Val Decker obviously breached its contract. But this suit is not concerned with that breach but with the alleged nonperformance of Armour. More accurately, then, the issue here is whether Val Decker's delay in shipment was such a *material* breach of contract as to excuse Armour from performance.

It is undisputed that Armour was not purchasing for itself, but rather its purchase was to fulfil a prior contract with Western. Val Decker knew that at the time the contract was negotiated. It is, therefore, apparent, and the trial court so found, that delivery to Western on Friday afternoon, December 28, was the essential purpose of the contract. While that was the purpose, it was *not* the promised performance. The legal

issue is not whether time of delivery was *more* important than time of shipment. The question is whether time of shipment was under the circumstances a material term of the contract and, if it was, whether the breach by the delay in performance was a material one. One important factor in determining the materiality of delay in performance is the existence of a contract provision. Appellee has stipulated that. Another factor is the purpose of the contract. This was a contract for resale on a prior commitment and both parties knew this. Time was therefore an important aspect of the transaction—both as to shipment and as to delivery. There could be no delivery without a shipment. There is also the testimony of Carl Decker, Vice President of Val Decker. He testified to his conversation with Mr. Busse (Armour's broker).

"Q. Do you recall whether there was a shipping date indicated?

"A. I believe so, I believe there was.

"Q. Do you recall it?

"A. Well, other than the telephone conversation with Mr. Busse, which was on that date and he so indicated that the shipment was to go forth that night.

"Q. That night?

"A. Yes."

The majority opinion appears to hold that delivery to Western was the important thing and shipping time was unimportant (at least up to the point where timely delivery would be impossible). On the other hand, the opinion relies on shipment as establishing the C. A. F. contract. The result is that Armour is liable even though the shipment was late and even though the actual delivery was not made even remotely within time. I believe that this result fails to give consideration to one highly important aspect of the transaction—the *risk* of late delivery at destination.

As Judge Bryant has pointed out, all parties knew that the road conditions were not good and normal transit time was twenty-four to thirty hours. The time period between 11:00 P. M., December 26, and desired arrival at 3:00 P. M., December 28, is forty hours. Each hour's delay increased the risk to Armour—one might say disproportionately increased the risk. Armour did not want the hogs for its own use. As the time

margin decreases, even slight mechanical failures or road obstructions would substantially affect the ability to make a timely delivery. Val Decker used a double loading crew and requested two drivers for the truck. This, in addition to the testimony quoted, indicates that Val Decker appreciated the importance and possible effect of the delay.

The actual shipment was made at 12:25 P. M., December 27, leaving twenty six and one-half hours for transit. At no point between the negotiation of the contract at 5:30 on the 26th and the time of shipment did Val Decker notify Armour that there was a delay. One of the obligations of a buyer under a C. A. F. contract is to procure the transportation.

The question here can be pointed up obliquely. What would Armour's rights have been if Val Decker had notified Armour of the delay before shipping? To say that Val Decker could insist on the right to ship, and correspondingly, that Armour could not rescind, is to give Val Decker the power to substantially alter the risk to Armour of accomplishing delivery to Western and fulfilling the purpose of the contract. Perhaps Armour would have authorized the late shipment, but perhaps too, it might have found another processor with better chances of making a timely delivery to Western. I think it apparent that Armour would have had the right to seek better arrangements, and to rescind the Val Decker contract without liability.

Surely Val Decker's failure to inform Armour of the delay does not add to Val Decker's legal position i. e. its right to ship late without prior approval by Armour. Nor is it relevant that subsequent actual events prove that even timely shipment would not have reached Western until after the 29th. Armour can be held to assume the risk of transit only if Val Decker substantially performed its side of the contract. Val Decker's right to ship under the C. A. F. contract must be determined as of the time of shipment.

In my opinion, the delay in performance by Val Decker substantially altered Armour's position, and there was no right to ship without a confirmation by Armour made with knowledge of the delay. In view of that conclusion, the events which occur after the time of shipment are immaterial to the ultimate liability of the parties. The actual shipment would legally be

a unilateral venture by Val Decker. It was good gamble, but unfortunately it did not succeed. The subsequent phone call to Armour by the driver would, at most, constitute a conditional acceptance of the late shipment. The condition not having been fulfilled, it does not affect liability.

The judgment should be reversed and remanded with instructions to give judgment to the defendant.