**HARLOW & JONES, INC., a New York Corporation, Plaintiff,**

v.

**ADVANCE STEEL COMPANY, a Michigan Corporation, Defendant.**

**Civ. A. No. 5–70979.**

United States District Court,
E. D. Michigan, S. D.

Nov. 30, 1976.

James K. Robinson, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for plaintiff; Franz S. Leichter, Wachtell, Manheim & Grouf, New York City, of counsel.

Allen Zemmol, Dingell, Hylton & Zemmol, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

FEIKENS, District Judge.

This is an action in contract, brought by the seller, Harlow and Jones, Inc. (hereinafter "Harlow"), against the buyer, Advance Steel Co. (hereinafter "Advance"), to recover damages and costs for an alleged breach of an agreement to purchase 1000 tons of imported European steel. Defendant denies liability, claiming that the shipment of steel was late and was therefore properly rejected under the contract. The parties agree that their respective rights and liabilities in this action are governed by the Uniform Commercial Code.[1] The pertinent facts, as established by the testimony and exhibits presented at trial, are summarized:

In late June, 1974, Robert Stewart, president of Advance, had several telephone conversations with a William VanAs, an independent steel broker who is authorized to solicit orders on a commission basis from customers in the Great Lakes area on behalf of Harlow. During these conversations, VanAs informed Stewart of the availability of some 5000 metric tons of cold-rolled steel which Harlow could import from a West German mill for shipment during September–October, 1974. On July 2, 1974, Stewart advised VanAs that he was interested in purchasing 1000 tons of this shipment. The terms of the transaction were recorded by VanAs on his worksheet of July 2, 1974, and later that same day

---

1. New York law would govern if the contract was formed there or if Harlow's sales form S–2372 is found to control; argument could also be made that Michigan law governs under M.C.L.A. § 440.1105(1). The result is the same in either event, since both states have enacted the Uniform Commercial Code. For convenience, all citations to the U.C.C. in this opinion will refer to the Official Text of 1972.

were relayed by VanAs to Carl Greve, president of Harlow.

On July 9, 1974, Greve mailed to Stewart a sales form, S–2373, confirming a sale of 1000 metric tons of cold-rolled steel, with shipment from a European port during September–October, 1974. That same day, Greve placed an order with Centro Stahlhandel GMBH for the 1000 tons and included a copy of its sales form to Advance. Stewart received Harlow's confirmation form but never signed or returned the enclosed copy as requested. On July 19, 1974, Stewart prepared a worksheet for the transaction in question, and on the basis of this worksheet prepared and mailed Advance's purchase order, B–04276, containing the same quantities, specifications (with minor revisions), and shipping dates as Harlow's confirmation form. Advance's purchase order was received by Harlow on July 25, 1974, but was never signed or returned.

The steel was shipped from Europe on three separate vessels. Approximately 214 tons were shipped on the M.S. Federal Lakes in September, 1974, and arrived in Detroit in October, 1974. Another 195 metric tons were shipped on the M.S. Ermis in October, 1974, and arrived in Detroit in early November, 1974. These two shipments were accepted and paid for by Advance. The balance of the steel was shipped from Antwerp on November 14, 1974, and arrived in Detroit on November 27, 1974. In a letter to Harlow dated October 29, 1974, Advance rejected this third shipment because of "late delivery." In a letter dated November 7, 1974, Harlow rejected Advance's cancellation and denied that a delay had yet developed which would justify Advance's action.

Further exchanges of correspondence ensued, with each party reaffirming its position that the other had breached its responsibilities under the contract. After arrival, the steel was warehoused in Detroit for a time and eventually sold at a loss by Harlow to other buyers, including Advance.

Harlow has taken the position throughout these proceedings that its sales confirmation form S–2373 of July 9, 1974 was an offer which defendant accepted by mailing back Advance purchase order form B–04276 on July 19, 1974. Harlow construes Advance's purchase order as a "definite and seasonable expression of acceptance," within the meaning of U.C.C. § 2–207, which provides that such a response to an offer

which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

U.C.C. § 2–207(1). Under this construction of the evidence, the terms of Harlow's S–2373 form would control. Specifically, there are a host of fine print terms on the back of this document which state that all delivery dates are approximate, contingent upon timely delivery by Harlow suppliers, and qualified by disclaimers of liability for "force majeure," acts of God, labor strikes, etc.[2]

2. 5. Delivery

(a) All delivery dates are approximate and not guaranteed.

(b) Time of delivery is indicated on the basis of a corresponding promise of delivery by our suppliers. We shall not be responsible in case of delays or failure to deliver on the part of our suppliers, unavailability of shipping space, changes of sailing schedules and/or diversion of steamer while in transit.

(c) If force majeure, acts of God, labor disturbances, or other causes beyond our control should result in delays or nondelivery on our part, or on the part of our suppliers, or of the manufacturers, we shall not be liable, and the buyer agrees to accept delivery within a rea-sonable time after the aforementioned circumstances cease to exist and correspondingly extend time of delivery. Any extra expenses incurred because of any delays or failure of buyer in accepting delivery shall be for buyer's account.

(d) "Force majeure" shall include fire, strikes, breakdown of machinery or accidents of any kind, any delay in, interference with or inability to obtain transportation, inability to obtain suitable insurance or any license or permit now or hereafter required; Municipal, State, Federal or any government action, regulation or prohibition effecting the production, transportation, sale or delivery of, any of the goods affected by this contract; the present or

Though no delivery date in fact appears on Harlow's S–2373, the form does specify a shipment date of "September–October, 1974." Harlow produced testimony from VanAs, Greve, and two disinterested local steel importers who all agreed that, according to an accepted steel importing trade usage, shipment in September–October means delivery in October–November. Since delivery here of the final shipment occurred before the end of November, Harlow contends that its shipping obligations were met and that Advance improperly and prematurely rejected this shipment on October 29. Harlow also sought to establish that the delay in shipment past the end of October was caused by bad weather, a Canadian pilot strike, and an accident in the Welland Canal—all contingencies which Harlow claims were unanticipated and beyond its control.

Advance takes the position that Harlow's sales form S–2373 was an offer which Advance rejected shortly after its receipt through a series of oral communications with VanAs. Stewart testified that he telephoned VanAs some time between July 9 and July 22 and informed him that he could not accept the boilerplate disclaimers regarding delivery on the back of Harlow's sales form and that VanAs had told him to just circle the objectionable terms and return the form. Stewart also testified to a second conversation with VanAs during this period in Stewart's office during which Stewart circled certain terms on the back of Harlow's S–2373 form and wrote on the front "delivery no later than October 31"; VanAs was reported to have said, "fine, no problem."

Advance contends that it had good reason to be concerned about the shipping dates. According to the testimony of Stewart and others, the market for steel was high and unstable during the summer and fall of 1974, and in any purchase of imported European steel, time was therefore of the essence. Having rejected the shipping terms contained in Harlow's sales form S–2373 for this reason, Advance argues that its purchase order B–04276, sent on July 22, 1974, was a counter-offer which Harlow accepted by making two partial shipments in October. Under this analysis, the terms of Advance's purchase order B–04276 would control. B–04276 contains a shipment date of "Sept–Oct 74," and further specifies that a failure to ship within this time allows Advance to cancel the order without notice.[3] Since these terms of shipment were bargained for and crucial, in Advance's view, and since the balance of the steel was not in fact shipped until November 14, Advance argues that its rejection of this last shipment was fully justified under the contract.[4]

■ Each party has sought to establish that the terms of this agreement are governed by the provisions of its own contract form. This is certainly understandable, since both S–2373 and B–04276 provide am-

---

any subsequent war conditions or any development thereof or any new outbreak of war; loss, destruction, or detention of ship, embargo; failure for any reason whatsoever of subcontractors, carriers, manufacturers or Seller's vendors to perform any contract relating to the goods hereby sold; or any and all causes beyond Seller's control.

3. This order not valid unless acknowledged and accepted immediately. If the material is not shipped on or before the time specified herein, the purchaser has the privilege of cancelling without notice.

4. During July, 1974, plaintiff and defendant negotiated two other contracts for the purchase of steel. The first was initiated by Advance's purchase order form B–04242, mailed July 15, 1974, to which Harlow responded with its sales

form S–2386 on July 17, 1974. The second agreement was formed on the basis of Advance's purchase order B–4304 sent on July 23, 1974, and Harlow's sales form S–2391 mailed on July 30, 1974. These two transactions were completed without dispute or mishap. Both parties have construed these transactions as a course of dealing which can be used to explain their conduct in this case. The court finds that both of these transactions occurred either subsequent to or contemporaneously with the transaction here in question and thus do not constitute a course of dealing as defined in U.C.C. § 1–205. The evidence relating to these other contracts is therefore irrelevant.

ple disclaimers of liability for late shipment and delivery. But in taking these respective positions, both Harlow and Advance have misread the evidence. The court finds that an oral contract for the purchase of steel was formed before either party began sending or receiving written contract forms.

The court finds that an agreement to purchase the 1000 tons of European steel was made through the several telephone conversations between Stewart and VanAs during the week of July 2, 1974. Greve testified that much of the steel importing business is conducted by phone and that oral contracts are often made in this way and then later confirmed in writing. This method of contract formation is also recognized by the Uniform Commercial Code, § 2–204(1):

A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

The conduct of the parties here indicates a common understanding that the sale had been arranged as of July 9, 1974. Harlow apparently assumed such an understanding, since on July 9, 1974, it mailed an order to its German supplier for the 1000 tons and included the size and grade specifications which Advance had given to VanAs. Harlow's S–2373 form sent that same day could hardly be an offer to Advance then, especially since Harlow styled it as a sales confirmation form and never followed up on Advance's failure to sign and return it as requested.

Advance's conduct also corroborates the existence of an oral contract as of July 9. Advance has always taken the position that VanAs had at least apparent authority to negotiate contracts on behalf of Harlow, and this was apparently Stewart's understanding at the time of his telephone conversations with VanAs in early July, 1974. Stewart having indicated to VanAs during these conversations not only Advance's interest in purchasing 1000 tons of steel but also the various size and grade specifica-

tions and shipping dates which Advance wanted, it becomes difficult to accept his testimony that Advance had made no firm commitment to purchase at this point.

Advance's conduct upon receiving Harlow's confirmation form does not undercut the court's conclusion that an oral contract had already been negotiated at this point. Even if believed, Stewart's testimony indicates only an objection to S–2373's boilerplate terms regarding delivery and does not show any disagreement with Harlow's assertion in the cover letter to this form that a contract for the purchase of steel had already been agreed upon. It is worth noting that VanAs flatly denies the assertion that Stewart ever informed him that delivery was to be made by October 31, and VanAs denies that he ever agreed to any such modification of Harlow's sales confirmation. Stewart did not remember ever having mailed to Harlow the copy of S–2373 with Advance's written notation for delivery by October 31. Moreover, the purchase order form B–04276 which Advance did eventually send to Harlow on or about July 22, 1974 was admittedly prepared in reference to Harlow's sales form, yet contains no indication that delivery was to be made by this date.

Even though it is difficult to identify the exact point at which a binding contract was formed, that does not prevent the court from finding that an agreement was in fact made during the series of telephone conversations conducted by the parties between July 2 and July 9, 1974. U.C.C. § 2–204 speaks directly to this point:

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

The fact that shipping and delivery terms were not completely ironed out during oral negotiations is likewise unimportant. U.C.C. § 2–204(3) provides:

(3) Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a

reasonably certain basis for giving an appropriate remedy.[5]

Having found that a contract to purchase the steel in question was made initially on an oral basis, the written forms sent by both parties must be construed as confirmatory memoranda. In order to determine the specifics of a contract formed in this manner, U.C.C. § 2–207(3) provides for an integration of the parties' confirmations on the following basis:

> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.[6]

There is in this case a substantial agreement between the confirmation forms of the parties. The forms contain the same price terms, weight and grade specifications (with one minor exception), and the same shipment date of September–October, 1974.

■ More important, and largely ignored by the parties throughout these proceedings, both forms specify a "C.I.F." shipping term. This provision renders the contract a shipment as opposed to a destination contract. U.C.C. § 2–320. Practically speaking, this means that the seller himself is not required to ship or deliver the goods under the terms and dates otherwise provided; rather, the seller is obliged to make a proper contract with his carrier for timely shipment or delivery,[7] and having made such a contract, title and risk of loss pass to the buyer.[8]

An argument could be made that the inclusion of a C.I.F. shipment term in this contract supports defendant's position that Harlow was the defaulting party. Under U.C.C. § 2–320, transfer of title under a C.I.F. contract is made to depend solely on the seller's provision for timely shipment through his carrier. Advance has continually emphasized that shipment was in fact late by two full weeks. Advance argues that the bad weather, pilot strike and canal accident described by plaintiff's witnesses were never linked to the delay of this shipment and that Harlow did not do all that it reasonably could have to ensure shipment by October 31. Harlow therefore breached its duties under § 2–320, and title to the steel in question, in Advance's view, never passed.

---

5. See also U.C.C. § 2–311(1):

> Options and Cooperation Respecting Performance
>
> (1) An agreement for sale which is otherwise sufficiently definite (subsection (3) of Section 2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

6. This provision is explained in Official Comment 6. to § 2–207:

> Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).

7. Under U.C.C. § 2–320(2):

> (2) Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to
> (a) put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination; and
> (b) load the goods and obtain a receipt from the carrier (which may be contained in the bill of lading) showing that the freight has been paid or provided for; . . . .

8. See Official Comment 1. to U.S.C. § 2–320:

> (1) The C.I.F. contract is not a destination but a shipment contract with risk of subsequent loss or damage to the goods passing to the buyer upon shipment if the seller has properly performed all his obligations with respect to the goods. Delivery to the carrier is delivery to the buyer for purposes of risk and "title."

This argument would appear to be Advance's best ground for escaping liability under the contract. Yet the court is unpersuaded. There is a further provision of the U.C.C. governing performance under a C.I.F. shipment contract, § 2–504—a provision which effectively undercuts defendant's reliance on the delay in shipment:

§ 2–504. Shipment by Seller

Where the seller is required or authorized to send the goods to the buyer and the contract does not require him to deliver them at a particular destination, then unless otherwise agreed he must

(a) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and

(b) obtain and promptly deliver or tender in due form any document necessary to enable the buyer to obtain possession of the goods or otherwise required by the agreement or by usage of trade; and

(c) promptly notify the buyer of the shipment. Failure to notify the buyer under paragraph (c) or to make a proper contract under paragraph (a) is a ground for rejection only if material delay or loss ensues.

The key provision here is the final part of this section, which requires a "material delay" before a buyer can reject a C.I.F. contract on the basis of late shipment. Official Comment 6. makes this point even clearer:

6. Generally, under the final sentence of the section, rejection by the buyer is justified only when the seller's dereliction as to any of the requirements of this section in fact is followed by material delay or damage. It rests on the seller, so far as concerns matters not within the peculiar knowledge of the buyer, to establish that his error has not been followed by events which justify rejection.

■ Was there, then, a material delay in this case which would justify Advance's rejection of October 29? The court holds there was not. Though not shipped until November 14, 1974, the steel in question did arrive in Detroit on November 29, 1974, and the court accepts the testimony of Harlow and the several expert witnesses it produced, all of whom related that under a recognized trade usage, a shipment term of September–October implies delivery by October–November. Cast in this light, the record indicates that any delay in shipment was cured by timely delivery and that Advance therefore acted prematurely in repudiating the agreement.

There is no universal formula for determining when a delay in shipment becomes material, and § 2–504 makes no attempt to elaborate on what is meant by a "material delay." The issue of materiality must depend in each case upon the particular circumstances involved. In this case, there is ample evidence to conclude that it was delivery, not shipment, which primarily concerned Advance, and it is upon this basis that a finding of immaterial delay is made.

Advance's own letter of cancellation, dated October 29, 1974, states that the shipment in question was rejected for "late delivery." Advance's subsequent letter to Harlow, dated November 13, 1974, likewise cites "late delivery" as the reason for cancellation. Stewart's testimony regarding his objections to and attempted modifications of Harlow's sales form S–2373 further corroborates his concern over delivery dates, not shipment dates. Nor was this apparent emphasis on arrival time unusual in the context of this transaction. As one local steel importer testified, you cannot sell imported European steel to a local manufacturer or processor until it arrives from Europe.

Neither party has been able to cite to the court a past case dealing with the situation here presented—where a seller has breached a contractual shipment term but still managed to make timely delivery. However, the court through its own research has uncovered one such case, and it appears to provide some authority for the court's analysis. *Val Decker Packing Co. v. Armour and Co.*, 184 N.E.2d 548 (Ohio Ct. of Comm. Pl.1967), *aff'd* Ohio App., 177 N.E.2d 401,

involved a contract for the sale of a truck-load of dressed hogs under which the seller was obliged to arrange for a carrier and to ship by "11 p. m. 12/26/56." The contract contained a provision for "C.A.F." shipment, a term with the same legal effect as the C.I.F. term involved in this case. See Ohio's Revised Code §§ 1315.19 and 1315.20; see also *Val Decker Packing Co. v. Armour and Co.*, 177 N.E.2d 401, 403 (American Meat Packers "Trade and Term Definitions," Art. 6). In a confirmatory memorandum to the seller, defendant buyer made it clear that prompt delivery was its primary concern:

> "Note: Please show on bill of lading in large size, bright colored print or crayon that Western Pork Packers, Inc. desire to unload these hogs not later than 3:00 P.M. Friday, 12/28 and as much sooner as possible."

*Val Decker Packing Co. v. Armour and Co., supra* at 549. The hogs were in fact not shipped until 12:25 P.M. December 27, 1956, and due to unforeseen weather and mechanical breakdowns with the truck, did not arrive at buyer's place of business until December 31, at which point they were rejected.

Defendant buyer sought to justify its rejection by arguing that the C.A.F. term contained in the contract required timely shipment before title to the goods passed, and since the shipment was late, buyer had "materially breached" the agreement and therefore prevented title from passing. The court in *Val Decker* rejected this argument, finding that delivery time, not shipment time, was the primary concern of the parties and that a delay in shipment was therefore not of such material importance as to justify buyer's cancellation of the order:

> [N]either the defendant nor Western Pork Packers, Inc. were particularly interested in the time at which the hogs left Piqua. They were interested in the time at which they arrived at Worchester. Therefore, we feel that the time of shipment, mentioned in the contract, was not made of the essence "by its terms"

nor was there anything in the conduct or acts of the parties that made it of the essence of the contract, nor was it an essential term thereof.

*Val Decker Packing Co. v. Armour and Co., supra* at 551. Upon this basis, the court found no material breach on seller's part and judgment was entered against defendant buyer accordingly.

Admittedly, *Val Decker Packing Co.* was decided under Ohio's own case law and former commercial statutes, not under the Uniform Commercial Code, but this only demonstrates that U.C.C. §§ 2–320 and 2–504 have not really departed from nor modified traditional contract doctrine regarding shipment contracts. A material delay in shipment has traditionally been required before a buyer under a C.I.F. agreement is allowed to cancel his order, and a merely technical delay or a delay which is later cured by timely delivery has never by itself justified cancellation, since this would, in effect, work a penalty or a forfeiture upon the seller.

Advance argues with some merit that its conduct should not be judged in hindsight but rather in the context of the circumstances presented at the time of rejection. Advance points out that at that point in time, shipment was not likely until well into November, and considering the usual 30-day transit time, this would mean delivery in December. Advance contends that a decision had to be made at that time, in order to preserve its rights under the contract, and the fact that subsequent events proved Advance wrong in its expectations provides no basis for finding an unjustified cancellation. A good faith judgment to cancel, in Advance's view, is all that can reasonably be expected.

This argument is unpersuasive. The court has no real reason to doubt Advance's good faith in concluding by October 29, 1974, that the steel in question would not, in all likelihood, be delivered until December, but the court finds that Advance had other means, short of cancellation, to protect itself in that event. Sec. 2–609 outlines the proper and more reasonable course

of conduct for a buyer in defendant's position:

§ 2–609. Right to Adequate Assurance of Performance

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Advance here never demanded adequate assurances from Harlow. Advance's letter of October 29, 1974, indicates a total repudiation of the contract, not a mere temporary suspension of performance.

Had Advance taken the course prescribed by Sec. 2–609, Harlow would have had the opportunity to effect a timely delivery and so cure any delay in shipment. In light of this available remedy, Advance's outright rejection of the contract on October 29, 1974 was unjustified. No delay at all, either in shipment or delivery, had in fact occurred at that point, and no material delay would have occurred had Harlow been permitted to effect delivery by November 31, 1974.

Accordingly, the court holds that Advance breached the contract by improperly and prematurely rejecting shipment. Harlow's subsequent resale of the steel is authorized by U.C.C. § 2–703(d) and was made in a commercially reasonable manner. Under U.C.C. § 2–706, Harlow may therefore recover the difference between the resale price and the contract price, together with any incidental damages incurred. Harlow produced evidence showing that a net loss of $105,954.40 was taken on the resales, and that storage and handling costs of $2,607.22 were also incurred. The total is $108,561.62, and Harlow is entitled to a judgment for that amount together with costs.

An appropriate order may be submitted.