SCOTT BRASS, INC.

v.

**C & C METAL PRODUCTS CORP.**

**Civ. A. No. 74–166.**

United States District Court,
D. Rhode Island.

July 10, 1979.

David A. Schechter, Providence, R.I., for plaintiff.

Robert G. Flanders, Jr., Providence, R.I., for defendant.

## OPINION

PETTINE, Chief Judge.

The controversy in this case is centered around a February, 1974 purchase order placed by the defendant, a New York manufacturer of brass products, with the plaintiff, a Rhode Island corporation engaged in the processing and selling of brass strips.

On February 1, 1974, the plaintiff and defendant entered into a verbal agreement for the purchase and sale of brass strips. The price at which certain of these strips would be sold—$1.17 per pound—was confirmed in letters between the parties of February 8 and February 13. Subsequently, plaintiff sent a standard acknowledgment form which had various typed-in entries reflecting the kind of merchandise to be shipped, a price of $1.17 per pound for the shipments here in question, and a "promise date" of March 1, 1974. In addition, the printed face of the form read, in part:

> Our acceptance of your order is expressly made conditional on your assent to the additional or different terms and conditions stated on the face and printed on the back hereof in their entirety and on your agreement that the terms and conditions stated on the face and printed on the back hereof shall constitute the sole terms and conditions of the order.

There also was printed on the front of the form, in bolder type, "This order will be billed at prices in effect on date of shipment." The back had printed, among other things, "The prices of the products specified herein will be Seller's prices in effect on date of shipment."

In March and in April of 1974, the plaintiff raised its published prices for brass; on the basis of the new price schedules, it refigured the defendant's February 1 order, which had not been delivered on March 1, and began shipments to the defendant accompanied by invoices stating the higher rate. On April 8 and 11, the defendant

wrote to the plaintiff acknowledging receipt of the invoices and stating that the prices therein were incorrect. Specifically, defendant's April 8 letter read, "Please refer to our order # 5988 and your acknowledgment . . . . Please note there are two prices on the invoices that are incorrect. Both invoices should have been billed at $1.17 per pound as per our order and your acknowledgments." This letter also enclosed a check for $15,000 as payment on account and asked that the plaintiff "come back with corrected invoices or credits whichever" was easier.

Scott Brass did not answer these letters until April 25, 1974, though in the meantime it did cash the $15,000 check and continued shipping brass. The plaintiff's April 25 response stated that the February order was not accepted on a firm-price basis; that they could not control the cost of metal and in keeping with industry practice, such increases are passed on to the buyer; that they stood on their invoiced price. On certain other acknowledgments in transactions with others, whenever the price was to vary from that stated in the invoice, the plaintiff would stamp on the acknowledgment "[b]ecause of uncertain market conditions and uncertain metal supplies that exist today . . . the pricing for this order will be based on Scott Brass, Inc.'s published prices in effect at the time of shipment." No such stamp appeared on these acknowledgments.

Plaintiff's present claim of $9,151.61 is based on the difference in the amount of payments due for brass at $1.17 per pound versus the price eventually billed in the invoices accompanying shipments. In addition, Scott Brass claims damages resulting from defendant's failure to return scrap brass in the amount of 40% of its purchase orders. Plaintiff contends that, during the negotiations, defendant was told that the scrap metal market would become short and, as a consequence, defendant would have to return scrap brass to Scott Brass. According to plaintiff, C & C, which had just disposed of a truck load of such scrap, promised that thereafter it would be accumulated for plaintiff.

Finally, C & C counterclaims for damages it suffered due to defective and non-conforming brass it received from the plaintiff. In April of 1974, C & C received 2,145 pounds of defective brass strips which caused a die to break as the brass was being processed. C & C demanded reimbursement for its damages and full credit for the defective goods. On May 20, 1979, Scott Brass acknowledged the defect (although they contested it at trial) and offered to run a replacement order for a like amount of the damaged material; it also requested that the defective brass be returned. Defendant responded that when it received delivery of the replacement brass, it would do so. To this the plaintiff stated it was not their policy to enter replacement orders until the rejected material was received for final inspection, and it reiterated that upon receipt, it would enter an immediate replacement order. As a result, C & C corrected the defect itself at a loss of $256.56, plus a replacement for a broken die at a cost of $2,290.00.

The plaintiff argues that the scrap metal shortage was published in all the trade papers and that, to alleviate the shortage, the plaintiff had various pricing methods. Premium prices would be charged if no scrap was returned as against the alternative of adjusting the base price on the "basis of an expected forty (40%) percent scrap return" of all metal bought from the plaintiff. Scott Brass concludes that the defendant knew all these facts and, being an astute buyer took advantage of the lower price on the metal and assumed the obligation to return scrap. Again it states this was the custom of the industry.

The evidence, as the Court finds it, does not support the plaintiff's position. To begin with, the defendant emphatically denies that any discussion ever took place concerning the return of scrap metal; the first time they ever heard anything of this was when the present controversy got into litigation. Furthermore, throughout this dispute, which resulted in the exchange of numerous letters, never once did Scott

Brass mention C & C's alleged failure to return scrap. Indeed, the plaintiff and defendant did business together continually from September, 1973, and at no time did they include such a condition in their dealings. The plaintiff seeks support from the fact it had sent letters to all its customers requesting their "cooperation in returning scrap." However, this was prior to the time it commenced dealing with the defendant. More importantly, it is significant to this Court that, while the plaintiff claims to have intended that the return of scrap metal be an integral part of their transactions, this was not put in writing. The invoices, forms, and many letters exchanged between the litigants are completely silent on this issue.

The plaintiff also argues that returning brass was an established custom in the trade. If so, this was not known to the defendant nor ever discussed in the sales the parties did consummate before this litigation. It likewise argues that defendant's position in this case is contrary to trade practices which recognized substantial price variations caused by shortages; usage in the trade was to sell such metal on a "floating basis." I need not decide what effect, if any, such alleged trade customs would have on the outcome of this case, if they did in fact exist. I do not find that there was sufficient proof of any trade custom that scrap brass was to be returned; nor do I find that it was a custom in the brass industry to price brass as of the date of shipment according to its availability. The evidence portrayed a nebulous and virtually undiscoverable market. The plaintiff's testimony was that

> [i]t grows very rapidly. You could find these, these facts are hidden, of course, to the general public and the user and you could have a definite shortage from one week to the next. There would be plenty of copper today and within one week's time there would be a shortage and you start to hunt around for copper and not find it except for those that were hoarding it and expected the prices to rise.

Inconsistencies in Scott Brass' testimony regarding its own pricing practices weaken its position. First it said that it "believed" that there was a brass shortage when C & C placed its February 1, 1974 order. If so, one would assume that it negotiated with the effect of that shortage in mind, yet Scott Brass did not claim a higher price for its deliveries until April. Then it offered testimony that it was not the custom to charge firm prices for its brass, yet it admitted that it did charge firm prices to customers similar to C & C. Finally, plaintiff stated "the entire industry has changed from 1977 . . . half of the industry had followed suit and the other half has not to this present date."

The Court also notes that on March 26, 1974, Scott Brass credited C & C for overpayments on pre-February 1, 1974 orders which had been invoiced at prices higher than those specified in the purchase orders and acknowledgments. This granting of credit for such higher pricing confirms the practice between these parties of selling and buying at firm prices. Furthermore, during the whole period that is now in question, C & C was paying Scott Brass on account pursuant to the confirmed prices set forth in the February acknowledgments in order to take advantage of a 1½% discount for early payment. Scott Brass accepted these payments, cashed C & C's checks and continued to ship out further brass strips pursuant to the February 1, 1974 order.

All this is incompatible with the alleged custom claimed by Scott Brass. As Section 2–208 of the Uniform Commercial Code provides,

> [w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determining the meaning of the agreement.

In the difficult task of weighing credibility and finding facts, I am persuaded by the defendant's testimony and reject the plain-

tiff's contention regarding variable pricing and the return of scrap metal as industry-wide practices. It has not carried its burden on these points.

### Conclusions of Law Regarding the Parties' Contract

The plaintiff rests its case on *Roto-lith v. F. P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962). There the buyer ordered an emulsion product from the defendant. The defendant seller acknowledged the order with a warranty disclaimer which was received by the plaintiff no later than the goods. The "plaintiff did not protest defendant's attempt so to limit its liability, and in due course paid for the emulsion and used it." *Id.* at 499. A breach of warranty suit followed; the court found that the acknowledgment was "expressly conditional" and therefore not an acceptance, but rather a counter offer accepted by the buyer in receiving and using the goods. The court stated: "To give [Section 2–207 of the Uniform Commercial Code] a practical construction, we must hold that a response which states a condition materially altering the obligation solely to the disadvantage of the offeror is an 'acceptance * * * expressly * * * conditional on assent to the additional * * * terms.'" It found

that "[p]laintiff [had] accepted the goods with knowledge of the conditions specified in the acknowledgment. It became bound."[1] *Id.* at 500.

The plaintiff claims this case is stronger than *Roto-lith* because the language of the acknowledgment is precisely that of Section 2–207(1)[2] and no implication is necessary; it relies upon "the traditional theory of constructive knowledge and acceptance of contractual terms based on the duty to read contractual agreements to which one is a party." *See Matter of Riverdale Fabrics Corp.*, 306 N.Y. 288, 118 N.E.2d 104, 41 A.L.R.2d 867.

If *Roto-lith* were indistinguishable from this case, the Court would agree. However, in the case at bar the plaintiff acknowledged the defendant's order in February but did not ship the goods together with invoices until April. Although no objection was made upon receipt of the acknowledgment, I cannot agree with the plaintiff that defendant would have objected immediately if it really believed that it had a firm price. Prior to receipt of this form the parties had reached an oral agreement as to a firm price, and letters exchanged during February evidenced that their agreement was at $1.17 per pound. It wasn't until C & C received the goods and invoices in April

---

1. Certain legal writers disagree with the *Roto-lith* reasoning. Professors White and Summers ". . . would find that a contract was formed upon the exchange of documents without reference to the subsequent performance." They state that any terms in the acceptance that did not appear in the offer must pass through subsection (2) of 2–207 to become part of the contract and consequently, since the parties to the contract are merchants the disclaimer materially altered the contract and so did not become part of it. J. White & R. Summers, Uniform Commercial Code § 1–2, p. 23 (1972).

Section 2–207 reads in full:

*Additional Terms in Acceptance or Confirmation.*

*1*) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

*2*) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

  a) the offer expressly limits acceptance to the terms of the offer;

  b) they materially alter it; or

  c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

*3*) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of [The Code].

2. Article two of the Uniform Commercial Code is found at R.I.G.L. § 6A–2–201 et seq. For the sake of convenience, the Court will use parallel citations to the Uniform Commercial Code.

that it could know there was a material alteration, or at least an attempt at such an alteration, in the terms of its agreement with Scott Brass. At most it might have been puzzled by the presence of a typed-in firm price figure on a standard form containing a variable price provision, but the Court will not hold C & C to a duty to have determined which provision would prevail.

More importantly, the Court in *Roto-lith* found that the acknowledgment was received no later than the goods and the invoices a day or two thereafter. At that point, there was no objection, and the goods were accepted and used with full knowledge of the additional terms. The defendant was bound because its performance constituted assent to those terms. *Roto-lith* does not require the same result where there has been a timely objection. In such a case, as we have now before the Court, the buyer's objection would at least serve to negate additional terms, such as the variable price term on Scott Brass' acknowledgment form, under U.C.C. § 2–207(2). Here, however, it has the greater effect of preventing the Court from applying the *Roto-lith* concept of the acknowledgment as a counter offer to which the buyer assents by performance, because Scott Brass' acknowledgment was "expressly conditional on assent" to additional terms, U.C.C. § 2–207(1), and C & C's only response was a protestation rather than assent. Thus, even if the acknowledgment is taken as a counter offer under *Roto-lith*, the Court cannot conclude that it was accepted by performance, given C & C's timely notification of what it perceived as a mistake in the price term. *Compare Falcon Tankers, Inc. v. Litton Systems, Inc.,* 355 A.2d 898 (Del.Super.1976) (treating a similar acknowledgment as a counter offer requiring express consent, but finding such consent).

In this situation, the Court may avail itself of the rule of decision set forth in U.C.C. § 2–207(3):

Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Here, there certainly was conduct recognizing the existence of a contract. Plaintiff continued to ship brass to C & C and accepted and cashed its April 8 payment check. C & C, on the other hand, forwarded the check to Scott Brass with the obvious understanding that a contract existed and that a mistake had been made as to one of its terms. Moreover, it continued to accept brass shipments.

Therefore, the Court finds that a contract did exist by virtue of the conduct of the parties. According to U.C.C. § 2–207(3), the terms of that contract are those "[upon] which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of . . . 'Article Two of the Code.'" *See generally, Harlow & Jones, Inc. v. Advance Steel Co.,* 424 F.Supp. 770 (E.D.Mich.1970); *Ebasco Services, Inc. v. Pennsylvania Power and Light Co.,* 402 F.Supp. 421 (E.D.Pa. 1975); *Falcon Tankers, Inc. v. Litton Systems, Inc., supra.*

Here there is no dispute as to contract terms involving such matters as quantity, specifications, or the timing of shipments. There was no provision for the return of scrap brass by C & C; the writings of the parties never mentioned the matter and the Court has found no oral agreement on the subject.

The only term of the parties' contract which remains to be resolved is the price term. In this case, the writings of the parties do not agree as to a fixed price of $1.17 per pound; although it is found in the letters exchanged during February and as a typed entry on plaintiff's acknowledgment form, that form qualifies the price quotation with the phrase, "This order will be billed at prices in effect on the date of shipment." Defendant's letters of April 8 and 11 expressed its disagreement with this provision and evidenced its understanding

that the parties had reached an agreement at the $1.17 price. Scott Brass' response of April 25 contests this assertion.

■ However, the Court finds that the parties did reach an oral agreement as to a price of $1.17 prior to the sending of plaintiff's acknowledgment form. As I have noted, this is evidenced by the letters exchanged on February 8 and 13. The Court will apply this price term to the contract found to exist pursuant to Section 2–207(3).

■ The Statute of Frauds, Section 2–201 of the Code is no barrier to this holding. The Court is not enforcing an oral contract reached during February, but rather referring to that agreement, which was evidenced by writings in the form of letters, to supply the missing price term in a contract formed under Section 2–207(3). Moreover, the Court notes that the goods which are the subject of that oral agreement already have been shipped, paid for and accepted. For that reason, the Statute of Frauds expressly does not bar reference to the oral agreement. § 2–201(3)(c). As Comment Two to Section 2–201 states,

> Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists. If the Court can make a just apportionment, therefore, the agreed price of any goods actually delivered can be recovered without a writing . . ..

Thus, the variable price provision on plaintiff's acknowledgment form may be viewed as a subsequent attempt to qualify the parties' prior negotiation of a firm price. Whether or not Scott Brass intended this provision to apply from the outset, their caveat was not communicated to C & C during the initial negotiations when the oral agreement was reached.

This holding is supported both by the prior course of dealings between the parties (§ 2–205) and the subsequent course of their performance (§ 2–208). The Court heard evidence that Scott Brass had credited C & C in the past for overpayments on invoices which had stated prices higher than those

established in underlying oral agreements. Subsequent to the commencement of the brass shipments, Scott Brass continued to ship brass after cashing defendant's payment check which explicitly was given on a firm price basis.

A contrary holding would place Scott Brass in a manipulative position. Its acknowledgment indicated a "promise date" (delivery date) of March 1, 1974, yet it was making shipments under the order here in question up to at least April 8. Were the Court to enforce the variable price provisions upon which Scott Brass relies, plaintiff would be able to recover for price increases experienced more than one month after the date upon which it had promised delivery. Of course, if the price fell during that period it could have stood fast on its negotiated price of $1.17 by refraining from lowering the prevailing, published prices upon which the variable price term was to be based for subsequent deliveries.

Therefore, the Court concludes that plaintiff's claim for recovery of accounts receivable based on invoices charging prices greater than $1.17 is without merit and must be rejected.

## COUNTERCLAIM

### *Defective and Non-Conforming Shipment of Brass Strips*

The plaintiff points to paragraph 8 of the Terms and Conditions of Sale contained in the acknowledgment which states, ". . . should any such product supplied hereunder be defective in material or workmanship, Buyer shall notify Seller immediately and Seller shall repair or replace the defective products without cost to Buyer, or, at Seller's option, repay the purchase price upon return of the defective products . . .. The obligation of Seller to repair or replace defective products, or at Seller's option, to repay the purchase price shall be the limit of Seller's liability and Buyer's exclusive remedy." From this the plaintiff argues that since the defendant did not return the defective brass strips there can be no recovery. The defendant, on the oth-

er hand, argues that Scott Brass offered only to replace the order and that the contract does not require return of defective goods where the seller elects to replace rather than repay.

■ While this limitation of damages clause is authorized by the Uniform Commercial Code (see § 2–719), the Court has found that no contract was formed on the basis of plaintiff's acknowledgment. Therefore, the clause cannot be applied, because it was not expressly assented to, and the Court must resort to the general provisions of the Code regarding buyer's remedies.

■ Defendant claims damages in the amount of $256.56 for correction of the defect in the brass shipment here in question, as well as $2,290 for replacement of a die broken through use of the defective brass. While recovery of the former sum certainly is authorized by § 2–714, damage to the die is consequential in nature and governed by § 2–715 which provides that:

(2) Consequential damages resulting from the seller's breach include:

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably [have been] prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

Defendant did show that the brass shipment in question was defective; one edge of the brass strips was imperfect and prevented proper feeding into defendant's processing machine. However, while the defect was obvious—it was apparent to the Court in an exhibit—defendant offered little proof, beyond its own assertion, that damage to the die was proximately caused by use of the brass strips in question, and it admitted that other causes were possible. Nor did defendant show that the damage could not have been reasonably avoided, and in the absence of expert testimony on the point the Court is left to speculate whether brass strips with a defect which was so apparent to the Court would have been used by a reasonably prudent businessman processing such materials. Even if defendant claimed breach of an implied warranty (no express written warranties existed in the contract which the Court has found to have existed under Section 2–207(3) of the Code), defendant has failed to carry its burden of proof to establish the causal chain between the original defect and damage to the processing die. Therefore, the Court will allow recovery by defendant on its counterclaim in the amount of $256.56 for correction of the defect, but it will not allow defendant's counterclaim in the amount of $2,290.00 for damage to the die.