**SKYLINE STEEL CORPORATION,**
**Plaintiff and Counter-Defendant,**

v.

**A.J. DUPUIS COMPANY, Defendant**
**and Counter-Plaintiff.**

**Civ. No. 85–75073.**

United States District Court,
E.D. Michigan, S.D.

Nov. 19, 1986.

Peter Swiecicki, Andrea Maya Windholz, Detroit, Mich., for plaintiff and counter-defendant.

Robert E. Butcher, Southgate, Mich., for defendant and counter-plaintiff.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

### I. STATEMENT OF FACTS

This diversity action, which was tried before the Court without a jury, is to collect payments due under the terms of several contracts. Plaintiff Skyline Steel Corporation ("Skyline") is a New Jersey corporation with its principal place of business in East Rutherford, New Jersey. Skyline sells and leases steel and steel products to customers throughout the United States. Its sales agent for the Midwest region is William ("Bill") Horvath, Jr., a steel broker in Southgate, Michigan.

Defendant A.J. Dupuis Company ("Dupuis") is a Michigan corporation which is currently inactive. At all times prior to and immediately after consummation of the contracts presently in dispute, Dupuis was a contracting company with its principal place of business in Southgate, Michigan. Bruce Sells, Jr. was President of the A.J. Dupuis Company and John Perry was a company employee.

In 1984, Dupuis was selected as the subcontractor on a municipal project at the Lakewood Street Bridge at Harbor Island in Detroit, Michigan. D. Macro Cement was the general contractor on, and the City of Detroit was the owner of, this project. In mid-June 1984, John Perry telephoned Bill Horvath (as they were the respective agents of Dupuis and Skyline) inquiring about prices and availability of Skyline sheet piling for use in connection with the Harbor Island project. Subsequent telephone conversations between these two agents resulted in two oral contracts whereby Dupuis would purchase and lease sheet piling from Skyline. The terms of these contracts were conveyed to Skyline's credit office in New Jersey for invoicing purposes on June 21, 1984.

The relevant terms of the two oral contracts were as follows. According to Skyline, Dupuis agreed to purchase 34,550 pounds of steel sheet piling, at $0.26 per pound, for a total amount of $8,983.00. Payment terms were net 30 days. In addition, Dupuis agreed to lease 37,862 pounds of sheet piling for an initial month's rental fee of $3,123.45 and $340.74 per month thereafter or, in lieu of rental payments, a liquidated cost of $0.26 per pound. Payment terms were net upon Dupuis' receipt of monthly invoices, at the beginning of each monthly period.

Skyline alleges delivery of the sheet piling to Dupuis at the Harbor Island construction site on June 29, 1984. On that date, Dupuis was furnished with Skyline's Invoices number DI 29223 and K 35275 reflecting the sheet piling Dupuis had purchased and leased. Notwithstanding delivery, Dupuis did not pay any amounts to-

wards the purchase price of $8,983.00 or the initial month's rental fee of $3,123.45. The only payment Skyline has received to date from Dupuis has been $681.48, representing two monthly payments on the leased piling. This suit is for the sums alleged to be due.

At some point after delivery of the steel, a credit manager at Skyline's main office in New Jersey notified sales representative Horvath that no payment had been received on the Dupuis account. Horvath made repeated unsuccessful demands for payment, via telephone conversations and meetings with John Perry and Bruce Sells. Dupuis told Horvath that Skyline would receive payment for its steel upon Dupuis' receipt of payment from either the City of Detroit, the general contractor, or the contractor's bondsman. By November 12, 1984, Dupuis had received more than $82,-000.00 from D. Macro Cement, the general contractor, none of which has been applied towards Dupuis' overdue accounts with Skyline.

In addition to the Harbor Island project, Defendant Dupuis was also a subcontractor on the Third Street Sewer Outfall Project, on which the City of Detroit was the owner and the Barton-Malow Company was the general contractor. The leased sheet piling used in the former project was subsequently moved by Dupuis to the latter project without authorization from Skyline. Skyline notified the owner and general contractors of the Harbor Island and Third Street projects on March 13, 1985 and June 4, 1985, respectively, that it was claiming the benefit of the Michigan Public Works Bond Act, Public Act No. 213 of 1963, as amended, M.C.L.A. § 129.201 *et seq.*, arising out of Skyline's delivery of sheet piling for use in both projects.

Defendant A.J. Dupuis Company does not dispute that it entered into two contracts to purchase and lease sheet piling from Skyline, that the piling was delivered to and accepted by Dupuis, and that it made two rental payments to Skyline totalling $681.48. However, in answering the complaint, Dupuis advances several general and affirmative defenses for nonpayment on its accounts. Dupuis generally alleges that it did not agree to the following contractual terms: the net 30 day payment for the purchased piling; the initial rental payment of $3,123.45 and the liquidated monthly cost of $0.26 per pound for the leased piling; and the monthly prejudgment interest charges of 1.5% and 1.0% on overdue balances. Dupuis affirmatively asserts, inter alia, that Skyline's statutory notice of its claims to the City of Detroit and the general contractors pursuant to the Michigan Public Works Bond Act constituted an election of remedies precluding recovery from Dupuis of payments due.

Dupuis has also filed a counterclaim against Skyline alleging failure to deliver the ordered sheet piling on the dates and at the times expressly promised by Skyline's representatives. Anticipating timely delivery, Dupuis had called in work crews who could not function until after delivery of the piling. Efforts to secure piling from other suppliers had been unsuccessful. As a result of the late deliveries, Dupuis allegedly incurred additional labor costs and other incidental expenses. Dupuis has requested the Court to offset these costs against any legitimate claim that Skyline may have against Dupuis.

For the reasons to be stated below, the Court will enter judgment for Plaintiff on its breach of contract claim. Judgment will also be entered for Plaintiff on Defendant's counterclaim.

## II. CHOICE OF LAW

Before discussing the merits of this case, the Court must first determine the state law that controls the interpretation of the contracts at issue. The present diversity action was brought in the United States District Court for the Eastern District of Michigan. Since federal courts must follow the choice of law rules of the state in which they sit, Michigan choice of law rules will be applied in the instant case. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Liberty Mut. Ins. Co. v. Vanderbush Sheet Metal*

*Co.*, 512 F.Supp. 1159, 1166 (E.D.Mich. 1981). "Under Michigan law, interpretation of contract provisions are governed by the law of the state in which the contract was entered into." *McLouth Steel Corp. v. Jewell Coal & Coke Co.*, 570 F.2d 594, 601 (6th Cir.1978). *See also Wells v. 10–X Mfg. Co.*, 609 F.2d 248, 253 (6th Cir.1979). Although there is no evidence that the parties discussed choice of law, the contract undeniably was made and to be performed in the State of Michigan. Therefore, Michigan law will govern Plaintiff's contract claim.

### III. THE CONTRACTS

The parties do not dispute that in 1984 John Perry, acting on behalf of Defendant Dupuis, telephoned Bill Horvath, Midwest Sales Representative for Skyline, and inquired about prices and availability of Skyline steel sheet piling. After several telephone conversations, two oral contracts were entered into whereby Dupuis agreed to purchase and lease sheet piling from Skyline. The terms of these contracts were embodied in confirmatory invoices.

Plaintiff's Exhibit 1 is Skyline Invoice number DI 29223 representing Dupuis' purchase of 34,550 pounds of steel sheet piling, at $0.26 per pound, for a total amount of $8,983.00. The order date was June 21, 1984 and the steel was shipped via common carrier on June 29, 1984. Payment terms were net 30 days with a past due interest charge of 1.5%.

Plaintiff's Exhibits 2 and 3 are Skyline Invoices number K 35275 and K 35278 representing Dupuis' lease of 37,862 pounds of piling for an initial month's rental fee of $3,123.45 and $340.74 per month thereafter or, in lieu of rental payments, a liquidated cost of $0.26 per pound. The order was dated June 29, 1984 and payment terms were net upon receipt of the invoice with a past due interest charge of 1.0%.

For the reasons outlined below, all of Dupuis' arguments are without merit. Du-

puis' failure to pay any amount for the purchased sheet piling and the initial month's rental for the leased piling renders it liable for breach of contract.

### A. THE UNIFORM COMMERCIAL CODE

The contracts at issue involve a "transaction in goods": the purchase and lease of steel. Skyline argues that because the underlying transaction involves goods, Article II of the Uniform Commercial Code ("U.C. C." or "Code"), Sales, as adopted in Michigan at M.C.L.A. § 440.2101 *et seq.*, should govern interpretation of the contracts. Dupuis objects to application of the U.C.C. on the ground that Skyline's first references to the Code were at trial; the U.C.C. was never mentioned in any of Skyline's pleadings. Skyline denies an obligation to plead the U.C.C.

■ The Court is in accord with Skyline's position on both counts. Contrary to Dupuis' suggestion, there is no authority whatsoever for imposing upon a party the obligation to specifically plead the U.C.C. and this Court declines to fashion such a rule in the instant case. The purchase and lease of steel *is* a transaction in goods. Therefore, the contracts will be examined pursuant to the Michigan U.C.C. provisions. *See Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.*, 429 F.Supp. 1039, 1048 (E.D.Mich.1976); *Bennett v. Columbus Land Co.*, 70 Mich.App. 403, 405, 246 N.W.2d 8 (1976).

As a defense for nonpayment on its Skyline accounts, Dupuis generally alleges that it did not agree to the following contractual terms. First, Dupuis denies agreement on a net 30 day payment term. Dupuis claims that its receipt of payment from the City of Detroit, the general contractor, or the contractor's bondsman was a condition precedent to Skyline's receipt of payment from Dupuis on the piling contracts. Second, Dupuis denies agreement on the initial rental payment of $3,123.45 [1] and the liqui-

---

1. The first month's rental for the leased piling was equivalent to one-third the value of the     materials.

dated monthly rental of $0.26 per pound[2] for the leased sheet piling. Application of the relevant MCLA provisions leads this Court to conclude that Dupuis did, in fact, agree to the above-mentioned terms.

■ Assuming, arguendo, that Dupuis did not orally agree to these contractual terms, their appearance in the subsequent written invoices constitute "additional terms." M.C.L.A. § 440.2207(2)(b) and (c) provide that

The additional terms are to be construed as proposals for addition to the contract. *Between merchants* such terms become part of the contract unless ... they materially alter it; or notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(Emphasis added.) *See also Am. Parts Co., Inc. v. Am. Arbitration Ass'n,* 8 Mich. App. 156, 166–67, 154 N.W.2d 5 (1967). Skyline argues that even if the so-called "additional terms" were not orally agreed upon by the parties, they became part of the contracts because they did not materially alter the prior oral agreement and the contracts were entered into "between merchants." Dupuis objects to its classification as a merchant. After reviewing testimonial evidence, the Court holds that Dupuis is a merchant within the meaning of the U.C.C.

The U.C.C. defines a "merchant" as

a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

M.C.L.A. § 440.2104(1). Skyline, as the seller of the sheet piling at issue, affirma-

tively acknowledges its status as a merchant. Bill Horvath, Jr., Skyline's Midwest Sales Representative, testified at trial that he has received a bachelor of science in construction engineering and has been in the construction business for eighteen years. Approximately twelve years ago, Horvath started, and was Vice President and Sales Engineer of, a steel supply firm named Contimco, Inc., which is presently closed. At all relevant times before and after the closing of Contimco, Horvath has been a sales engineer for Skyline and another steel supplier. Dupuis on the other hand, denies that it is a merchant.

Dupuis argues that a purchaser of goods, such as itself, is not a merchant. This interpretation of the statutory definition is clearly erroneous. The scope of M.C.L.A. § 440.2104(1) is not limited to a seller or supplier of goods, but also includes anyone else who deals in the goods and holds himself out as having knowledge or skill peculiar to the goods involved in the relevant transaction. Dupuis has done just that. Bruce Sells, Jr. testified that the A.J. Dupuis Company was established in 1899 as a concern specializing in marine construction. Before becoming inactive, Sells served as the company's president for eight to ten years. Dupuis, through John Perry and other company agents or occasionally Sells himself, negotiated with suppliers for the materials needed in Dupuis' subcontracting business. Consideration of the number of years the company was in existence, the nature of its business, and the conduct of company agents leads to the undeniable conclusion that Dupuis previously has dealt in steel sheet piling and its agents have held themselves out as having knowledge or skill peculiar to the use of such piling. Having fallen squarely within the language of the U.C.C., Dupuis must be considered a "merchant" for contract interpretation purposes.

---

**2.** Bruce Sells, Jr., former President of Dupuis, testified that Dupuis had been quoted a liquidation rate of $0.23 per pound. Bill Horvath denied that he had given anyone at Dupuis such a quote. Instead, Horvath stated that he had discussed with John Perry a *$0.26* liquidation rate when Dupuis was initially bidding on the Harbor Island project. Horvath's testimony was by far the most credible.

Between merchants, additional terms become part of the contract unless the terms materially alter the contract or the buyer objects to such terms within a "reasonable time" after notice of the terms is received. M.C.L.A. § 440.2207(b) and (c). Where a confirmatory writing is received and the recipient has reason to know of its contents, the contract will be enforceable against the recipient "unless *written notice of objection* to its contents is given *within 10 days* after it is received." M.C.L.A. § 440.2201(2) (emphasis added).

Dupuis has never alleged that the payment or rental terms materially alter the contracts. Similarly, Dupuis has never submitted *written* notification to Skyline of its objections to the additional terms until commencement of the present lawsuit.[3] The approximate two year period that elapsed after Dupuis received the written invoices and before it first objected to their terms in its answer to Skyline's complaint here does not comply with the 10 day notification period and is not notification within a reasonable time. Due to Dupuis' failure to timely object to the additional terms, the payment and rental terms became and presently are part of the contracts. Dupuis did not make the required payments to Skyline for the purchased and leased sheet piling within net 30 days and net receipt of invoice, respectively. Therefore, the Court finds that Dupuis is liable for breach of contract.

## B. THE PAROL EVIDENCE RULE

■ Dupuis not only denies agreement to the additional terms, but further alleges that instead of a net 30 day payment term, the parties agreed Skyline would be paid for the purchased steel only after Dupuis received payment from the City of Detroit, the general contractor, or the contractor's bondsman. The Court must bar this latter agreement on the basis of the parol evidence rule.

A confirmatory writing containing terms "intended by the parties as a final expression of their agreement ... may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented" by course of dealing, usage of trade or course of performance. M.C.L.A. § 440.2202(a). The testimony of Bruce Sells, Jr. to the effect that the parties agreed Skyline would be paid after Dupuis received payment is evidence of a contemporaneous oral agreement expressly precluded by the parol evidence rule. This testimony cannot be accorded any weight in the present proceedings. The Court, therefore, must conclude that the parties intended Skyline Invoice number DI 29223, containing the net 30 day payment term, to be the final expression of their agreement for the purchase of steel sheet piling. *See Watson-Higgins Milling Co. v. Gracyzk,* 253 Mich. 175, 178, 234 N.W. 132 (1931).

■ Further support for the conclusion that the parties agreed to a net 30 day payment term is found in the prior course of dealing between the parties. M.C.L.A. § 440.2202(a) provides that terms contained in a confirmatory writing may be explained or supplemented by course of dealing, usage of trade or course of performance. "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." M.C.L.A. § 440.-1205(1). The previous conduct between Skyline and Dupuis mandates a finding of a net 30 day payment term in the present transactions.

Bill Horvath, Jr. testified that prior to June 1984, he had received regular inquiries from Dupuis which resulted in several contractual agreements for the purchase, but not lease, of timber and steel

---

**3.** Bruce Sells, Jr. testified that upon receipt of Skyline's Invoices, he telephoned Bill Horvath and voiced his objections to the contractual terms contained therein. Since these alleged objections were verbal and not written, as re-quired by the U.C.C., the notification given was insufficient to preclude enforcement against Dupuis of the payment and rental terms of the contracts.

products from Skyline and other suppliers. It was common practice between the parties for Horvath and Sells (or another agent of Dupuis) to reach an oral agreement, to have Skyline then furnish a written confirmatory invoice encompassing the terms of the oral agreement, and to have payment terms be "net 30 days." Dupuis had an excellent and timely payment history with Skyline on purchases made before the transactions here in issue.

The June 1984 transactions represent the first time Dupuis had purchased *and* leased steel sheet piling from Skyline. Horvath further testified that with respect to lease agreements, Skyline generally required the initial month's rental fee to be paid cash in advance by the lessee. Because of Dupuis' excellent credit history, however, it was to pay the $3,123.45 fee net upon receipt of Skyline Invoice number K 35275.

During his testimony, Bruce Sells for Dupuis, noting Dupuis' excellent record of prompt payment, asserted that in all prior transactions between the parties, Dupuis did always make payment after it had been paid by the general contractor. Skyline countered that no supplier in the construction industry, including itself, would ever agree to such payment terms. Consideration of the prior course of dealing between the parties leads this Court to conclude that the "net 30 day" payment term is the operative and enforceable provision. In addition, the initial payment for the leased steel "net upon receipt of invoice" is equally enforceable. Moreover, this Court must note that, although Dupuis was indeed paid substantially by the general contractor in this case, it has failed to make any payment on this contract. So it did not act here in accordance with the alleged course of dealings.

## C. THE STATUTE OF FRAUDS

The next defense to this claim presented by Dupuis is the Statute of Frauds. Dupuis argues that the contracts for purchase and lease of the sheet piling are not enforceable because the contractual terms are not evidenced by a "writing." Skyline counter-argues that the confirmatory invoices are writings sufficient for the Statute of Frauds.

▪ Preliminarily, this Court finds that Dupuis has failed to timely assert the Statute of Frauds defense. Even if the Court were to overlook this defect, however, Skyline's transmission of a written confirmatory invoice and Dupuis' admission that a contract was entered into or, alternatively, Dupuis' receipt and acceptance of the delivered sheet piling are all sufficient, in and of themselves, to take the contracts at issue out of the prohibitions of the Statute of Frauds.

The Statute of Frauds is an affirmative defense which must be specifically pleaded in defendant's initial answer to the complaint or in an amended answer thereto. *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 547 (6th Cir.1981); *R.G. Moeller Co. v. Van Kampen Constr. Co.,* 57 Mich. App. 308, 311, 225 N.W.2d 742 (1975). The consequence of a failure to plead this defense is that it is waived and all testimony in support thereof is inadmissible. *Ben P. Fyke & Sons v. Gunther Co.,* 390 Mich. 649, 667, 213 N.W.2d 134 (1973).

Dupuis neither pleaded the Statute of Frauds defense in its answer nor asserted it in any pretrial documents. In fact, the defense was first raised by Dupuis' counsel at trial during closing argument. A closing argument is an inappropriate and untimely manner in which to raise the Statute of Frauds. Accordingly, the Court may summarily dispose of this argument.

▪ Assuming, however, that Dupuis had affirmatively asserted the Statute of Frauds in its pleadings, this defense still would not preclude enforcement of these purchase and lease contracts. Dupuis argues that these contracts are not enforceable because the contractual terms are not evidenced by a "writing." M.C.L.A. § 440.-2201(1) provides, in relevant part, that

a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is *some writing* sufficient to indi-

cate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . .

(Emphasis added.) The only term which must appear in the contract is the quantity term. *West Cent. Packing, Inc. v. A.F. Murch Co.*, 109 Mich.App. 493, 500–501, 311 N.W.2d 404 (1981); *Ace Concrete Prod. Co. v. Rogers Constr. Co.*, 69 Mich. App. 610, 613–14, 245 N.W.2d 353 (1976).

The contracts at issue in this case meet the statutory prerequisites for enforceability. Skyline and Dupuis entered into an oral agreement whereby Dupuis agreed to purchase 34,550 pounds of piling, valued at $8,983.00, and to lease 37,862 pounds of piling, valued at $3,123.45 plus $340.74 per month. Pursuant to company policy Skyline generated invoices embodying the terms of their oral agreement. The Court endorses Skyline's position that a confirmatory invoice *is* a sufficient writing to satisfy the Statute of Frauds. *Harlow & Jones, Inc. v. Advance Steel Co.*, 424 F.Supp. 770, 775 (E.D.Mich.1979); 2 CORBIN ON CONTRACTS, Statute of Frauds § 506, p. 727. The invoices generated by Skyline do contain the necessary quantity term. Although the invoices are not signed by the party against whom enforcement is sought, namely Dupuis, this does not preclude enforcement of the contracts. The U.C.C. provides that unless the recipient objects in writing to the contents of the confirmation within 10 days after its receipt, the writing will be deemed to satisfy the requirements of the Statute of Frauds. M.C.L.A. § 440.2201(2). *See also* CALAMARI & PERILLO, CONTRACTS §§ 19–34, pp. 722–23 (2d ed. 1977). As Dupuis did not object within the 10 day notification period, the purchase and lease invoices meet all statutory prerequisites.

■ Even if the Court found the confirmatory invoices to be an insufficient writing, there are other relevant facts which would take the purchase and lease contracts out of the Statute of Frauds. A contract is enforceable "if the party against whom enforcement is sought *admits* in his pleadings, testimony or otherwise in court that a contract for sale was made. . . ." M.C.L.A. § 440.2201(3)(b) (emphasis added). During his testimony, Bruce Sells admitted that the Skyline invoices were the written documents memorializing the purchase and lease transactions, although he denied agreement on all of the substantive terms. Thus, Dupuis' failure to deny the existence of the contracts will be interpreted as an admission that such contracts do exist.

Alternatively, a contract is enforceable under the U.C.C. "with respect to goods for which payment has been made and accepted or which have been received and accepted." M.C.L.A. § 440.2201(3)(c) (citation omitted). Dupuis admits, in its pleadings, its receipt and acceptance of the sheet piling delivered by Skyline. Not only was the piling used in the Harbor Island project but Dupuis has admitted that the piling was subsequently moved to the Third Street Sewer Outfall project.[4] Therefore, the receipt, acceptance and use of the piling constitutes an objective manifestation of Dupuis' assent to the contracts, thereby rendering it liable for the purchase and lease contract prices. *West Cent. Packing, Inc. v. A.F. Murch Co.*, 109 Mich.App. 493, 504, 311 N.W.2d 404 (1981).

## IV. THE MICHIGAN PUBLIC WORKS BOND ACT

A third defense presented by Dupuis for nonpayment on its overdue accounts is that

---

**4.** Bill Horvath testified that during contract negotiations, there was no discussion between the parties that the leased sheet piling could not be used on other projects because standard rental practices prohibited such inter-project movement. Notwithstanding the absence of an explicit prohibition, it has been Skyline's position throughout this litigation that Dupuis converted the piling to its own use on the Third Street

project without prior notice to, or authorization of, Skyline. Horvath, by affidavit, has stated that he was neither informed of nor consented to the transfer of the piling. Dupuis, on the other hand, responds in its pleadings that Skyline and Horvath were aware at all pertinent times of such alternate use because Skyline supplied additional materials for use by Dupuis on the Third Street project.

Skyline, by filing a notice of claim under the Michigan Public Works Bond Act, Public Act No. 213 of 1963, as amended, M.C.L.A. § 129.201 *et seq.*, has elected its remedies by choosing to proceed against the general contractors and/or their bondsmen. Because of that "election", Dupuis argues that it is essentially immune from this action. Dupuis further asserts that the contractors, bondsmen and/or the owner of the public works projects are necessary parties in the present action.

Skyline counter-argues that there is no inconsistency in protecting its interests by filing a notice of *potential claims* under the bonding statute while simultaneously pursuing a debt collection from the party with whom it has a direct contractual relationship. In its pleadings, Skyline readily acknowledges that it is not entitled to recovery from more than one party, or to collect more than it is owed.

The argument of election of remedies with respect to the Michigan bonding statute is one of first impression before this Court. Consideration of Dupuis' arguments in light of the Court's interpretation of the statute demonstrates the nonapplicability of the election doctrine to the case at bar. The Court further holds that the contractors, bondsmen and/or the owner of the public works projects need not be joined as necessary parties to this lawsuit.

The doctrine of election of remedies is an affirmative defense, *Kirby v. Monroe Paper Prod. Co.*, 1 Mich.App. 680, 137 N.W.2d 736 (1965), which "has been defined as the act of choosing between two or more different and coexisting modes of procedure and relief allowed by law on the same set of facts." 25 Am.Jur.2d, Election of Remedies § 1, p. 646 (citation omitted). The doctrine is a procedural rule designed to prevent double recovery for a single wrong. *Id.* at 647. *Accord Stroh Brewery Co. v. Grand Trunk W.R. Co.*, 513 F.Supp.

827, 834 (E.D.Mich.1981); *Riverview Coop., Inc. v. First Nat'l Bank & Tr. Co. of Michigan*, 417 Mich. 307, 312, 337 N.W.2d 225 (1983).

The validity of the doctrine need not be evaluated in the present case because the Court concludes that it does not prevent Skyline from proceeding against Dupuis for breach of contract. Notwithstanding this conclusion, it is instructive to outline the requirements for application of the election doctrine.

■ In order to apply the election of remedies doctrine in any context, there are three prerequisites that must be met. Dupuis correctly argues that the essential elements of the doctrine are set forth in MLP, Election of Remedies § 1, p. 382: "the existence of two or more remedies, the inconsistency between such remedies, and a choice of one of them." *See also Riverview Coop., Inc., supra* at 313. Dupuis, however, misapplies the elements to the facts of this case. None of the three prerequisites have been satisfied.

■ The first two prerequisites of the doctrine are that there exist two or more inconsistent remedies.[5] Skyline has two modes of *procedure* in which to collect the payments due under the terms of the purchase and lease contracts: to proceed against either Dupuis or the general contractors and their bondsmen, or all of the above. Although afforded two avenues of recovery, two or more *remedies* did not exist. The general theory on which materialmen are permitted to recover on a bond executed in connection with public works and improvements is third-party-beneficiary contract law. 17 Am.Jur.2d, Contractors' Bonds § 80, p. 255. Similarly, the theory of liability against Dupuis in the present action is based on breach of contract. The remedies Skyline would seek to recover in both instances are *damages* for

---

**5.** An inconsistency of remedies means that a certain statement of facts is relied upon as the basis to recover diametrically opposed remedies. For example, in a contract case, a party seeks a remedy based on the theory of affirmance of the contract or other transaction while

another remedy arising out of the same facts is based on the theory of the contract's disaffirmance or recission. MLP, Election of Remedies § 2, p. 384; 25 Am.Jur.2d, Election of Remedies § 13, pp. 653–54.

Dupuis' breach of contract. These remedies are not inconsistent. Where, as here, the available remedies are cumulative and consistent, the election of remedies doctrine has no application.

The third and final prerequisite is that the party elect to pursue one of the available remedies. An "election" occurs when one, by actually bringing an action or by some other unambiguous act with knowledge of the facts, indicates his choice of between two or more inconsistent remedies. MLP, Election of Remedies § 3, p. 386. Dupuis alleges that Skyline has made such an election of remedies.

Defendant's Exhibit 1 is a letter, dated March 13, 1985, sent by certified mail by Peter Swiecicki, counsel for Skyline, to the City of Detroit and D. Macro Cement. Skyline was submitting written notification that it had furnished sheet piling to the A.J. Dupuis Company for use in connection with the Lakewood Street Bridge, Harbor Island project. The amount due and unpaid as of this letter was $13,810.15. Courtesy copies were sent to Bruce Sells, Jr. (President of Dupuis), Joseph Zavattaro (Credit Manager in Skyline's New Jersey Office), and William Horvath (Skyline's Midwest Sales Representative).

Defendant's Exhibit 2 is a second letter, dated June 4, 1985, sent by certified mail by Peter Swiecicki to the City of Detroit and the Barton-Malow Company. Skyline reconfirmed it had supplied piling to Dupuis for use in the Harbor Island project and had made repeated demands for payment, now valued at $14,272.41. The purpose of this letter was to advise Barton-Malow of Skyline's "reasonable belief" that some of its leased piling has been transferred by Dupuis from the Harbor Island to the Third Street Sewer Outfall project, for which the Barton-Malow Company was the general contractor.[6] A courtesy copy was sent to Bruce Sells, Jr. Both letters were submitted pursuant to the Michigan Public Works Bond Act.

Dupuis affirmatively asserts that by submitting the foregoing notices (letters) of claim under the Michigan bonding statute, Skyline has unambiguously elected to pursue its remedies against the general contractors and/or their bondsmen, and may not sue Dupuis. Specifically, Dupuis alleges that "[t]he effect of Plaintiff's actions in seeking payment from the contractors and/or bondsmen is to permanently preclude recovery by Defendant of the amounts claimed by Plaintiff from either the contractor or the owner."[7] To support its position, Dupuis cites M.C.L.A. § 129.-207, particularly the last sentence which provides as follows:

The prime contractor shall not be required to make payment to a subcontractor of sums due from the subcontractor to parties performing except upon the receipt of the written orders of such parties to pay to the subcontractor the sums due such parties.

The Court finds Dupuis' interpretation of the statute to be untenable.

"The purpose and intent of [the Michigan Public Works Bond Act] is to safeguard and protect contractors and materialmen in the public sector." *Adamo Equip. Rental Co. v. Mack Dev. Co., Inc.,* 122 Mich.App. 233, 236, 333 N.W.2d 40 (1982). *Accord* 17 Am.Jur.2d, Contractors' Bonds § 44, p. 223. Recovery on the performance bond will be precluded unless the claimant sends written notification by certified mail to the principal contractor and governmental unit within statutorily specified time periods. M.C.L.A. § 129.207; 64 Am.Jur.2d, Public Works and Contracts § 101, p. 964. The statutory notice provisions are strictly con-

---

**6.** Dupuis has admitted in its pleadings that the piling was, in fact, moved from the Harbor Island to the Third Street Sewer project without Skyline's prior authorization.

**7.** Dupuis further contends that the Michigan bonding statute is not intended as a garnishment procedure. Even if the Court were to conclude that Skyline is using the statute for garnishment purposes, "[t]he availability of garnishment as a remedy does not preclude seeking satisfaction of a [claim] through a direct action." MLP, Election of Remedies § 1, p. 118 (Supp.1986), *citing, Davis v. Great Am. Ins. Co.,* 136 Mich.App. 764, 357 N.W.2d 761 (1984).

strued by the Michigan courts.[8] *See Hub Elec. Co., Inc. v. Aetna Casualty & Sur. Co.,* 400 F.Supp. 77, 79 (E.D.Mich.1975), *aff'd, Hub. Elec. Co., Inc. v. Gust Constr. Co.,* 585 F.2d 183 (6th Cir.1978), *cert. denied,* 440 U.S. 495, 99 S.Ct. 1282, 59 L.Ed.2d 495 (1979); *Square D. v. Aero Mechanical,* 119 Mich.App. 740, 744, 326 N.W.2d 629 (1982); *Charles W. Anderson Co. v. Argonaut Ins. Co.,* 62 Mich.App. 650, 233 N.W.2d 691 (1975). Written notification, however, while statutorily required to protect a supplier's rights, is not sufficient to enforce those rights. The mechanism established by the statute to execute payment under the bond is that the claimant *file suit* against the bonded entities. M.C.L.A. § 129.209.

■ This Court concludes that Skyline has not elected to pursue its remedies under the Michigan bonding statute, to the exclusion of a suit such as this. Mailing a notice of claim under M.C.L.A. § 129.207 does not represent an election on Skyline's part to collect only from the bonded entities, to the exclusion of Skyline's direct claim against Dupuis. Where, as here, Skyline is *statutorily required* to submit a notice of claim to adequately protect its interest under the bonding statute, this conduct, without more, does not constitute an unambiguous election of remedies.

Even if the Court were to conclude that filing a claim is an election, that conclusion would be of no consequence under the facts of this case. When a party, such as Skyline, is presented with alternate and consistent remedies, pursuit of one remedy in a separate forum (*i.e.,* filing a notice of claim with, or a lawsuit against, the general contractor and its bondsman) is not a bar to commencing a different form of action (*i.e.,* filing a lawsuit against the subcontractor). There is no election until one of the remedies is pursued to judgment. *See Rutter v. King,* 57 Mich.App. 152, 157–58, 226 N.W.2d 79 (1974), *cited in, St. Paul Fire & Marine Ins. Co. v. Michigan Nat'l*

*Bank,* 660 F.2d 196, 199 (6th Cir.1981). Since Skyline's notices of claim under the Michigan bonding statute have not been pursued to a final judgment, filing those notices did not preclude commencement of the present lawsuit against Dupuis.

■ In addition to the election of remedies argument, Dupuis further asserts that the contractors, bondsmen and/or the owner of the Harbor Island and the Third Street Sewer projects should have been joined as necessary parties in this lawsuit. The Court cannot agree with this position.

As a general rule, "joinder of parties is appropriate in situations in which their respective rights and obligations arise out of the same contract, transaction, occurrence or like circumstances, and any question of law or fact is common to the claims of them all." *Yedinak v. Yedinak,* 383 Mich. 409, 416, 175 N.W.2d 706 (1970). However, Michigan Court Rule 205.1 contemplates the necessary joinder of parties only when "their presence is essential to permit the court to render *complete relief*" (emphasis added). The "complete relief" requirement has been interpreted by the Michigan Court of Appeals to denote legal relief only. *Troutman v. Ollis,* 134 Mich.App. 332, 339, 351 N.W.2d 301 (1984). Where the only relief requested is a money judgment, this requirement is not met and the case is outside the scope of the necessary joinder rule. *Id.* at 340.

Skyline, in the case at bar, has brought suit against Dupuis to collect overdue payments on contracts for the purchase and lease of steel sheet piling. The only relief sought by Skyline is monetary damages equivalent to the contract prices plus accumulated interest. Since no relief other than damages has been requested, the "complete relief" requirement of the necessary joinder rule is not satisfied. The Court, therefore, holds that the contractors, bondsmen and/or the owner of the public works projects were not necessary parties in this litigation.

**8.** This case was not brought directly under the Michigan Public Works Bond Act. Therefore, the Court expresses no opinion whether Skyline has complied with the statute's notification requirements in a timely manner.

## V. DEFENDANT'S COUNTERCLAIM

Dupuis has filed a counterclaim against Skyline alleging that the latter failed to deliver the ordered sheet piling on the dates and at the times expressly promised by Skyline's representatives. Anticipating timely delivery, Dupuis allegedly had called in work crews who then could not function until after the tardy delivery of the piling. Efforts to secure piling from other suppliers were unsuccessful. As a result of the late deliveries, Dupuis allegedly incurred additional labor costs and other incidental expenses. Dupuis requests the Court to offset these costs against any legitimate claim that Skyline may have against Dupuis.

■■■ The Court, finding absolutely no documentary evidence to support this vague and nonspecific late delivery claim, and finding the testimony of Bruce Sells to be substantially incredible, holds that Dupuis' counterclaim must fail.

In its complaint, Skyline alleges delivery of the steel sheet piling to Dupuis at the Harbor Island construction site on June 29, 1984. Bill Horvath, Jr., Skyline's Midwest Sales Representative, testified that in mid-June, 1984, he received several telephone calls from Dupuis' agent John Perry inquiring about prices and availability of Skyline sheet piling for use in connection with the Harbor Island project. On June 21, 1984, the parties reached an oral agreement whereby Dupuis would purchase and lease sheet piling from Skyline. The terms of this agreement were conveyed to Skyline's credit office in New Jersey for invoicing purposes on the same day. John Perry

initially requested delivery "ASAP" and later specified delivery by June 29, 1984. Skyline Invoices DI 29223 and K 35275 reflect delivery was made as requested on June 29, 1984. Horvath attested to having personal knowledge that the piling was released in one lot per the invoices.[9] He never received any calls from Dupuis' agents regarding any alleged lateness of the delivery.

Dupuis counterclaims that the sheet piling was supposed to be delivered in *mid-May*, not late June, of 1984. Bruce Sells, Jr., former President of the A.J. Dupuis Company, testified that Dupuis began work at the Harbor Island project in early May of 1984. As the first contractor on the site, Dupuis' primary responsibility was to drive the *sheet piling*, which was to be supplied by Skyline, before any other work could be done on the project. When Skyline allegedly failed to deliver the purchased and leased piling, Sells personally called Bill Horvath several times and a Skyline dispatcher named "Diane" for five consecutive days to complain about the late deliveries.[10] The piling finally was delivered in two or more installments during a two week period from late May to early June. Dupuis' representatives signed a bill of lading[11] as materials were delivered. In light of the foregoing, Dupuis argues that Skyline's confirmatory invoices should not govern this delivery dispute because they are "dummy" invoices generated six weeks after the fact to coverup for Horvath's admitted late delivery.

Support for Dupuis' position of a May 1984 delivery date was initially limited to the testimony of Bruce Sells. However,

9. According to Horvath, Skyline's inventory of steel sheet piling is located locally in Detroit. All orders are shipped on the date(s) requested, subject to availability. Since inventory *was* available to satisfy Dupuis' purchase and lease orders, that piling was shipped on June 29, 1984. Dupuis, being a local purchaser, should have received delivery of the piling within four hours after the materials were loaded onto the common carrier.

10. Sells testified that Dupuis' efforts to secure the necessary piling from another supplier were unsuccessful. Although there was only a 2–3¢

per pound price difference among the various suppliers, none of the suppliers contacted by Dupuis had inventory available locally. Purchasing the piling from non-local sources would have resulted in an additional two-to-three week delay. Dupuis alleges that two and one-half weeks after it expected delivery, Skyline asked *Dupuis* to come and pick up the piling itself. Dupuis had no trucks with which to do so.

11. A "bill of lading" is "a document evidencing receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods...." M.C.L.A. § 440.1201(6).

later in the trial, Sells conveniently was able to locate in his personal files a "Construction Progress Chart" for the Harbor Island project, which was admitted into evidence as Defendant's Exhibit 3. The Chart, dated May 15, 1984, was prepared by the project's general contractor, D. Macro Cement, after a preconstruction meeting, was later updated, and then copies were supplied to all subcontractors. According to the Chart, a "Notice to Proceed" was effective April 25, 1984 and the bearing piling was to be started by the 20th day of the project.

Dupuis has failed to prove that the sheet piling delivered by Skyline was late for several reasons. First, the proferred Construction Progress Chart is not dispositive on the date of delivery issue because the information contained therein is merely *projected* starting dates for the various subcontractors. Second, the Chart specifically contemplates that *bearing piling* will be started by the 20th day of the project.[12] Bruce Sells testified that the sheet piling supplied by Skyline had to be installed *before* the bearing piling. However, the credibility of this statement was significantly attacked on cross-examination, when Sells reluctantly admitted it was possible that some bearing could have been driven before the sheet piling. On rebuttal, Horvath testified that bearing piling could be driven without any sheet piling; sheet piling is unrelated to bearing and can be driven first or last.

A third factor weighing heavily against Dupuis' position of a May 1984 delivery date is its failure to produce any bill of lading allegedly signed by Dupuis' representatives upon Skyline's delivery of the piling at the Harbor Island construction site. Sells testified that a roof leak destroyed Dupuis' copy of the bill of lading with many other of its records. The Court finds that testimony incredible. Therefore, it must be concluded that the purchased and leased sheet piling was delivered in accordance with the date contained in Skyline's Invoices: June 29, 1984.

In connection with the foregoing, Dupuis further alleges that as a result of the late deliveries, it incurred additional labor costs and other incidental expenses. Dupuis specifically claims pile-driving is a very specialized and unionized industry. In reliance on repeated promises made by Skyline's dispatcher "Diane", Dupuis kept a pile-driving crew waiting at the jobsite for fear of losing the crew.[13] Dupuis alleges that Skyline agreed to be liable for down time as standard in the industry and in accord with hourly charges for the equipment and personnel on the site. During his testimony, Sells estimated that the costs incurred as a result of down time could be calculated by multiplying Dupuis' alleged hourly down time rate of $375 per hour times 80 hours of down time (10 day delay × 8 hours per day).[14] There was not one bit of corroboration, written or oral, for that testimony.

The Court holds that Dupuis' alleged down time costs and other incidental expenses may not be offset against Skyline's legitimate breach of contract claim. Dupuis has failed to provide the Court with any documentation, or other evidence, in support of Sells' frequently contradictory testimony. In fact, Sells acknowledged during trial that Dupuis maintained spotty company records of the down time on the

---

**12.** Defendant's Exhibit 4 was a letter dated May 25, 1984, from John Perry of Dupuis to D. Macro Cement. This letter advised D. Macro that Dupuis had expended additional time and experienced delay due to the obstruction of pile # 4 on May 17, 1984. An extra charge ($375 per hour x 5 hours expended) would be assessed. Skyline objected to admission of this Exhibit on relevancy grounds. Dupuis' letter, a copy of which Sells testified was not sent to Skyline, refers to *bearing piling*. Horvath testified that Skyline had delivered the bearing piling separate from, and probably *before*, delivery of the sheet piling presently at issue. Notwithstanding Skyline's objection, Defendant's Exhibit 4 was admitted into evidence.

**13.** The piling-drivers were given insignificant busy work while waiting for the piling to arrive.

**14.** Sells was of the opinion that Dupuis' hourly down time rate of $375 per hour was a very low and reasonable rate. Skyline should have been charged more but was not, due to the previously good business relationship between the parties.

Harbor Island project and that he had been unable to locate his own personal notes for over one year. The absence of documentary evidence to support Dupuis' late delivery and down time claims coupled with the incredibility of Bruce Sells, necessitates that Dupuis' request for damages be denied and that judgment be entered for Skyline on Dupuis' counterclaim.

## VI. DAMAGES

Skyline asserts that under the Uniform Commercial Code, its remedy for Dupuis' nonpayment for goods purchased is the contract price agreed upon between the parties under each contract, plus interest. M.C.L.A. § 440.2709. Specifically, Skyline has calculated and requested damages as follows:

Purchased Steel:

| | |
|---|---|
| Sale price for 34,550 lbs. of sheet piling sold to Defendant at $0.26 per pound. | $8,983.00 |
| Interest per invoice rate of 1.5% per month on purchased piling from July 29, 1984 (payment due date of invoice) to September 16, 1986 (trial date). | $3,821.01 |

Leased Steel:

| | |
|---|---|
| Liquidation price for 37,862 lbs. of rented sheet piling not returned by Defendant, at $0.26 per pound. | $9,844.12 |
| Interest per invoice rate of 1.0% per month on rented piling from October 29, 1985 (date complaint was filed) to September 16, 1986 (trial date). | $1,181.29 |

The total amount due, according to Skyline, as of the trial date of this case is $23,829.42.

The measure of damages in an action for breach of contract is determined by the law of the state in which the contract was to be performed. *Transit Bus Sales v. Kalamazoo Coaches, Inc.*, 145 F.2d 804 (6th Cir. 1944); MLP, Damages § 3, p. 23. Since the contracts at issue were entered into and to be performed in the State of Michigan, Michigan law will govern calculation of the damages to which Plaintiff is entitled.

Under Michigan law, the party asserting the breach of contract has the burden of proving, by a preponderance of the evidence, its damages with reasonable certainty. *Walter Toebe & Co. v. Dept. of State Highways*, 144 Mich.App. 21, 373 N.W.2d 233 (1985); *Matter of Howarth's Estate*, 108 Mich.App. 8, 310 N.W.2d 255 (1981); MLP, Damages § 180, pp. 198–99. The remedy provided by the U.C.C. to a seller for a buyer's failure to pay for goods purchased is the contract price of the goods accepted, together with any incidental damages.[15] M.C.L.A. § 440.2709. *See also Haken v. Scheffler*, 24 Mich.App. 196, 180 N.W.2d 206 (1970); *Brown v. Harris*, 139 Mich. 372, 102 N.W. 960 (1905).

Plaintiff's Exhibit 1, Skyline Invoice number DI 29223, indicates that Dupuis agreed to purchase 34,550 pounds of steel sheet piling, at $0.26 per pound, for a total contract price of $8,983.00. Dupuis acknowledges it received the steel and was billed for this amount. Therefore, the contract price for the purchased steel is $8,983.00.

Plaintiff's Exhibits 2 and 3, Skyline Invoices number K 35275 and K 25278, indicate that Dupuis agreed to lease 37,862 pounds of piling for an initial month's rental fee of $3,123.45 and $340.74 per month thereafter. In lieu of rental payments, Invoice number K 35275 states that a liquidation cost of $0.26 per pound would be imposed on all unreturned piling. Dupuis admits making only two rental payments totalling $681.45 towards the leased piling. Skyline requests this Court to award the *liquidated* cost of $9,844.12 for the sheet piling leased and as yet unreturned by Dupuis.

In its pleadings, Dupuis argues that the parties never discussed or agreed to a liquidated damages provision. Instead, Skyline is said to have unilaterally added the provi-

---

**15.** The U.C.C. defines "incidental damages" to include "any commercially reasonable charges, expenses or commissions incurred in ... or otherwise resulting from the breach." M.C.L.A. § 440.2710.

sion to its invoice without Dupuis' consent or approval, subsequent to the order. Skyline, through the testimony of Bill Horvath, asserts that the liquidation provision *was* discussed with John Perry, an agent of Dupuis, during conversations leading up to consummation of the contracts.[16]

■ As the Court has previously noted, Dupuis denies the parties reached an agreement on several contractual terms, including the liquidation clause. Assuming no prior agreement, the appearance of this clause in the subsequent written invoice constituted an "additional term." M.C.L.A. § 440.2207. This term became part of the contract because Dupuis, as a "merchant" under the U.C.C., failed to object to the clause in writing within 10 days after the invoice was received. M.C.L.A. § 440.-2207(b) and (c).

Liquidated damages are the amount of damages agreed to and stipulated to by the parties in advance, which are recoverable by either party as just compensation for anticipated or actual harm caused by breach of the contract. *Worley v. McCarty*, 354 Mich. 599, 605, 93 N.W.2d 269 (1958), *citing, Curran v. Williams*, 352 Mich. 278, 282, 89 N.W.2d 602 (1958); MLP, Damages § 81, p. 77. Michigan law requires that all liquidated damages provisions be evaluated regarding their reasonableness. *St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co. of Michigan*, 115 Mich.App. 278, 284, 320 N.W.2d 244 (1982); *In re Constr. Diversification, Inc.*, 36 B.R. 434 (1983) (applying Michigan law); M.C.L.A. § 440.2718(1).[17] Whether a liquidation provision is unreasonable is a question of law for the court to determine in light of all the circumstances. *U.S. v. Swanson*, 618 F.Supp. 1231, 1243 (E.D.Mich.1981); *Moore v. St. Clair County*, 120 Mich.App. 335, 328 N.W.2d 47 (1982). "If the amount stipulated is reasonable with relation to the

possible injury suffered, the courts will sustain such a stipulation." *Curran v. Williams, supra* at 282.

■ Bill Horvath, Skyline's Midwest Sales Representative, testified at trial that the provision of Skyline Invoice number K 35275 providing for liquidated damages at $0.26 per pound for all unreturned steel sheet piling was a fair provision. Since Dupuis had not returned any of the 37,862 pounds of leased piling, the cost of the piling under the liquidation provision would be equivalent to the piling's purchase price. The Court finds the liquidation provision to be commercially reasonable and judicially enforceable, especially in light of Horvath's further testimony that suppliers other than Skyline usually have a liquidation cost greater than the actual purchase price of the leased goods.

A second factor indicating the reasonableness of the $0.26 per pound liquidation provision is Dupuis' conduct with respect to the sheet piling. Dupuis initially leased the 37,862 pounds of piling for use in connection with the Harbor Island project. The piling then was transferred to the Third Street Sewer project without Skyline's prior authorization. By doing this, Dupuis converted the sheet piling to its own use.

Conversion is an intentional tort. *Hansman v. Imlay City State Bank*, 121 Mich. App. 424, 428, 328 N.W.2d 653 (1982). The essential elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's intent to exercise dominion or control over the property inconsistent with plaintiff's ownership rights; and (3) damages. 18 Am.Jur.2d, Conversion § 2, p. 146. *Accord Trail Clinic, P.C. v. Bloch*, 114 Mich.App. 700, 705, 319 N.W.2d 638 (1982). When property has

---

**16.** *See supra* n. 2 and accompanying text.

**17.** M.C.L.A. § 440.2718(1) specifically provides that

Damages for breach by either party may be liquidated in the agreement but only at an amount which is *reasonable* in light of anticipated or actual harm caused by the breach,

the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.
(Emphasis added.)

been wrongfully converted, the plaintiff may recover damages equivalent to the fair market value ("FMV") of the property at the time of conversion. *Larson v. Van Horn*, 110 Mich.App. 369, 385, 313 N.W.2d 288 (1981); *Willis v. Ed Hudson Towing, Inc.*, 109 Mich.App. 344, 349, 311 N.W.2d 776 (1981); 18 Am.Jur.2d, Conversion § 105, pp. 219–220. This measure of damages constitutes, in essence, a forced sale.

■ Notwithstanding its use by Dupuis, Skyline was the rightful owner of the steel sheet piling supplied pursuant to the terms of the lease contract. It cannot be denied that Dupuis' exercise of dominion over the piling and the subsequent transfer of that piling to the Third Street Sewer project interferred with Skyline's ownership rights. Skyline was damaged by this conduct and is entitled to the FMV of the piling at the time of conversion.

Skyline appears to be uncertain as to the exact date of conversion and has not provided the Court with any FMV approximations. However, viewing the lease contract in light of all the circumstances, the Court estimates that the FMV for the leased piling is equivalent to the sale price per pound for the purchased piling: $0.26 per pound. Therefore, the Court holds that the contract price for the leased sheet piling is the liquidated amount of $9,844.12.

Dupuis further argues that the parties never discussed or agreed to the assessment of monthly prejudgment interest on Dupuis' overdue accounts with Skyline. This provision was allegedly added by Skyline subsequent to the order. Skyline, on the other hand, offered testimonial evidence to the effect that the interest penalties for late payment had been discussed with Dupuis' agent John Perry.

Dupuis appears to be confusing its duty to pay prejudgment interest with its duty to pay contractually agreed upon monthly interest on overdue accounts. In Michigan, the award of prejudgment interest is provided for by statute. M.C.L.A. § 600.6013 provides that:

> Interest shall be allowed on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint at a rate of 5% per year unless the judgment is rendered on a written instrument having a higher rate of interest in which case interest shall be computed at the rate specified in the instrument if such rate was legal at the time the instrument was executed. In no case shall the rate exceed 7% per year after the date judgment is entered.

The legislative purpose of this statute is to compensate the prevailing party for the expenses incurred in bringing the action and for the delay in receiving monetary damages. *Matich v. Modern Research Corp.*, 146 Mich.App. 813, 381 N.W.2d 834 (1985); *Saber v. Saber*, 146 Mich.App. 108, 110, 379 N.W.2d 478 (1985). Prejudgment interest is *mandatorily imposed* by the court in civil actions to which the statute applies, notwithstanding any contrary agreement of the parties. *Saber v. Saber, supra*. Therefore, the Court does not believe this to be the correct characterization of Dupuis' affirmative defense.[18]

■ The more probable characterization of Dupuis' affirmative defense is as an objection to imposition of the contract's monthly interest penalty for overdue balances. Assuming this position is correct, the Court is of the opinion that based upon the circumstances of this case and upon

18. On September 10, 1986, this Court entered a Stipulation and Order whereby the Defendant A.J. Dupuis Company, upon receipt of the arbitration award proceeds from the Barton-Malow Company, would place into escrow the sum of $20,000.00 pending the conclusion of the present lawsuit. At trial, Skyline requested that part of its damages be satisfied out of the escrow account. Dupuis found this request to be premature since no funds had been received as of the trial date. The Court notes that had the

$20,000.00 been received and deposited in escrow, prejudgment interest on this amount could have been avoided. *Cent. Michigan Univ. Faculty Ass'n v. Stengren*, 142 Mich.App. 455, 461, 370 N.W.2d 383 (1985). *See also Western Casualty & Sur. Co. v. City of Garden City*, 151 Mich.App. 83, 89 (1986) (statutory prejudgment interest does not apply to an arbitration award); *Morgan v. Kamil*, 144 Mich.App. 171, 375 N.W.2d 378 (same).

consideration of the evidence adduced at trial, the award of interest as a measure of damages is appropriate in the case at bar for several reasons. First, by failing to object to inclusion of the interest penalty provision in the lease invoice within 10 days after its receipt, Dupuis has manifested its assent to that provision and thereby is contractually obligated to pay interest accordingly. 5 CORBIN ON CONTRACTS, Damages § 1045, p. 279.

A second reason for awarding Skyline's request for interest relates to Dupuis' conduct with respect to the leased sheet piling. As a result of Dupuis' conversion of the piling, Skyline was unjustly deprived of its ownership rights and Dupuis had the benefit of "free" use of the piling for two years. An additional method of compensating Skyline for the inconvenience it has suffered due to Dupuis' nonpayment would be an award of interest. 18 Am.Jur.2d, Conversion § 121, p. 233. Therefore, the Court holds that Skyline is entitled to the contractually agreed-upon interest: 1.5% and 1.0% per month on overdue balances for the purchased and leased sheet piling, respectively.[19]

Finally, Dupuis affirmatively asserts that Skyline's failure to mitigate damages by failing to timely reclaim any leased piling precludes recovery on one of the contracts at issue. According to Dupuis, the duty to collect any rented sheet piling rested with Skyline. Such piling presumably could have been reclaimed by Skyline whenever it determined that the contract was in default or deemed it to be completed or otherwise terminated.

■ Under Michigan law, the party injured by a breach of contract must use reasonable efforts to mitigate damages actually sustained. *Wells v. 10–X Mfg. Co.,* 609 F.2d 248, 256 (6th Cir.1979); *Higgins v. Lawrence,* 107 Mich.App. 178, 309 N.W.2d

194 (1981); MLP, Damages §§ 71–72, pp. 65–70. Although the U.C.C. does not contain a mitigation provision, "Michigan has also recognized the duty to mitigate damages in breach of contract cases subject to the Uniform Commercial Code." *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 550 (6th Cir.1981), *citing, Ambassador Steel v. Ewald Steel,* 33 Mich.App. 495, 190 N.W.2d 275 (1971). Failure to mitigate damages is an affirmative defense. *TCP Indus., Inc., supra.* As such, the burden of proof is on the defendant to show that the plaintiff has not used every reasonable effort in its power to minimize losses. *Lorenz Supply Co. v. American Std., Inc.,* 100 Mich.App. 600, 300 N.W.2d 335 (1980), *aff'd,* 419 Mich.App. 610, 358 N.W.2d 845 (1984); *Gorman v. Soble,* 120 Mich.App. 831, 328 N.W.2d 119 (1982). Dupuis has not met that burden of proof.

The Court notes that Dupuis' argument of a failure to mitigate has been raised solely with respect to the *leased* sheet piling. Since this piling was converted to Dupuis' own use upon its transfer to the Third Street Sewer Outfall project, the Court may summarily dismiss this argument. "The rule requiring the injured party to mitigate damages does not apply where the invasion of property rights is due to defendant's intentional, or positive and continuous, tort." *Willis v. Ed. Hudson Towing, Inc.,* 109 Mich.App. 344, 311 N.W.2d 776 (1981); *Allen v. Morris Bldg. Co.,* 360 Mich. 214, 217, 103 N.W.2d 491 (1960), *quoting McCullagh v. Goodyear Tire & Rubber Co.,* 342 Mich. 244, 69 N.W.2d 781 (1955).

Having determined that the Plaintiff is entitled to the contract prices plus interest for the purchased and leased steel sheet piling; and that Defendant is not entitled to any costs on its counterclaim,

---

19. An award of interest on overdue payments does not preclude a simultaneous award of prejudgment interest. In the context of insurance contracts, the Michigan Court of Appeals has held that a court may properly order payment of both prejudgment interest (under M.C.L.A. § 600.6013) and interest on overdue payments on an award of no-fault personal protection benefits (under M.C.L.A. § 500.3142). *Perkins v. Riverside Ins. Co. of America,* 141 Mich.App. 379, 389, 367 N.W.2d 336 (1985). This Court concludes that both forms of interest are equally recoverable in the context of commercial contracts.

IT IS ORDERED that judgment be entered accordingly.

IT IS SO ORDERED.